JOHNSON & JOHNSON * MERCK CONSUMER PHARMACEUTICALS COMPANY, Plaintiff–Appellant,

v.

SMITHKLINE BEECHAM CORPORATION and Jordan, McGrath, Case & Taylor, Inc., Defendants–Appellees.

No. 918, Docket 91–9048.

United States Court of Appeals,
Second Circuit.

Argued Jan. 27, 1992.

Decided April 1, 1992.

Thomas C. Morrison, New York City (Steven A. Zalesin, Patterson, Belknap, Webb & Tyler, Robert J. Trainor, Johnson & Johnson, of counsel), for plaintiff-appellant.

Helene D. Jaffee, New York City (Robin E. Silverman, Daniel Rubin, Weil Gotshal & Manges, Michael C. Lasky, Davis & Gilbert, of counsel), for defendants-appellees.

Before: ALTIMARI, WALKER and McLAUGHLIN, Circuit Judges.

WALKER, Circuit Judge.

Johnson & Johnson * Merck Consumer Pharmaceuticals Company ("J & J * Merck") appeals from the final judgment of the United States District Court for the Southern District of New York, Honorable Miriam Goldman Cedarbaum, *Judge,* denying J & J * Merck injunctive relief and dismissing its complaint against defendants Smithkline Beecham Corporation ("Smithkline") and Jordan, McGrath, Case & Taylor, Inc. ("Jordan"). J & J * Merck, the manufacturer of MYLANTA, a nonprescription antacid, instituted this action in order to restrain Smithkline and Jordan, the manufacturer and advertiser of TUMS, respectively, a competing brand of antacid, from continuing to air certain television commercials that J & J * Merck claims are false and misleading in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and §§ 349 and 350 of the New York General Business Law.

Because we agree with Judge Cedarbaum's legal analysis, and because we conclude that her factual findings were not clearly erroneous, we affirm the judgment of the district court.

## BACKGROUND

J & J * Merck manufactures and markets MYLANTA, a popular nonprescription antacid product that is used to reduce heartburn by dyspepsia sufferers across the nation. MYLANTA contains aluminum hydroxide and magnesium hydroxide as its acid neutralizing agents. Smithkline produces the antacid TUMS. While TUMS is also extremely popular among victims of gastric distress, its formula relies upon calcium carbonate, rather than aluminum or magnesium salts, in treating indigestion and related ailments.

In September of 1990, Smithkline and its advertising agency, Jordan, instituted a television advertising campaign that sought to promote TUMS by comparing the ingredients contained in TUMS to those contained in other leading nonprescription antacids. The first commercial in this media

campaign was entitled "Ingredients." Ingredients shows a man and a woman seated at a lunch counter along with other patrons, all of whom are eating such marginally digestible items as grease-laden french fries and chili. A background announcer explains that this couple "ate the same lunch" and "got the same heartburn," but that "his antacid [TUMS] is very different." A series of competing products then appear on the screen—ROLAIDS, MAALOX, and MYLANTA. At the same time, the ingredients of each of these antacids are visually superimposed on the screen and listed by the announcer: ROLAIDS—"Aluminum Salt"; MAALOX—"Aluminum and Magnesium"; MYLANTA—"Aluminum and Magnesium." Immediately following this remedial menu, the ad continues with a close-up image of a roll of TUMS. The voice-over states that TUMS is "aluminum-free," and that "only TUMS helps wipe out heartburn and gives you calcium you need every day." After the woman is depicted pondering the virtues of a calcium-based antacid, the commercial ends with a visual and verbal statement of the advertisement's slogan: "Calcium rich, aluminum-free TUMS."

The makers of ROLAIDS, MAALOX and MYLANTA found the Ingredients advertisement impossible to swallow. After it was first aired, they immediately complained to Smithkline that Ingredients falsely implied that their antacids were harmful. In early October, 1990, they filed formal protests with each of the three major television networks, objecting to the Ingredients broadcast on the grounds that it was false and misleading. Representatives of Smithkline and Jordan met with network officials to discuss the protests lodged by TUMS' competitors, at which time they advised the networks that they would revise the Ingredients commercial. Thereafter, Smithkline and Jordan voluntarily withdrew Ingredients from the air. Although necessary background, the Ingredients advertisement is not the subject of this action.

In late October, 1990, Smithkline and Jordan released a second version of the TUMS commercial, entitled "Ingredients-Re-

vised." The difference between Ingredients and Ingredients-Revised was that the second advertisement deleted all references to TUMS as an "aluminum-free" product. Rather, Ingredients-Revised emphasized the fact that TUMS contains calcium, ROLAIDS, MAALOX and MYLANTA did not, and that calcium is good for you. In addition to the full version of Ingredients-Revised, Smithkline and Jordan began showing a shortened one. This commercial singled out MYLANTA as the sole target of comparison, while keeping the rest of the commercial substantially the same.

Suffice it to say, Ingredients-Revised did not settle the distress felt by J & J * Merck who continued to perceive appellees' advertising campaign as false and misleading. How did the maker of MYLANTA then seek to spell relief? L–A–N–H–A–M. J & J * Merck sued in the district court to enjoin appellees from continuing to broadcast Ingredients-Revised and its shortened version, on the grounds that the commercials violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and §§ 349 and 350 of the New York General Business Law. Specifically, J & J * Merck alleged that both Ingredients-Revised, and the shortened version, falsely represented that: 1) occasional ingestion of TUMS, in the manner directed for antacid relief, results in nutritional benefit to the consumer; and 2) the magnesium and aluminum contained in MYLANTA are unsafe for human consumption.

Initially, J & J * Merck moved for a preliminary injunction. Instead of granting the motion, the district court consolidated the application with an expedited trial on the merits. After a five day bench trial, Judge Cedarbaum concluded that J & J * Merck had "not shown that the message that occasional Tums users will benefit from calcium is false or misleading." Furthermore, she found "that the challenged commercials do not communicate the message that aluminum or magnesium are harmful or unsafe." On the basis of this, Judge Cedarbaum concluded that J & J * Merck failed to demonstrate "that 'Ingredients-Revised' is either false or misleading." Accordingly, she dismissed both J &

J * Merck's federal and state law claims. This appeal followed.

## DISCUSSION

On appeal, J & J * Merck has abandoned its claims relating to calcium and magnesium. Thus, the only issue before us now is whether the challenged commercials communicated a false or misleading message with respect to the safety of aluminum-based antacids. The district court explicitly found that "[i]f the challenged commercials indicated that ... aluminum [is] dangerous, they would be false and misleading."

J & J * Merck contends that, even though the content of the challenged commercials is literally true, Ingredients–Revised preys upon a publicly held misperception that the ingestion of aluminum causes Alzheimer's disease. According to J & J * Merck, the commercials accomplish this by repeatedly juxtaposing the absence of aluminum in TUMS with its presence in MYLANTA. In turn, this repetition supposedly links MYLANTA with an allegedly popularly held, yet unsubstantiated concern that aluminum is associated with Alzheimer's. Since the aluminum/Alzheimer's connection has not been scientifically established, J & J * Merck argues that Ingredients–Revised purposefully taps into a preexisting body of public misinformation in order to communicate the false and misleading message that aluminum-based antacids are harmful.

The gravamen of J & J * Merck's claim is that advertisers may be held liable for the knowing exploitation of public misperception. While this argument presents a novel theory of Lanham Act liability—one which we neither reject nor embrace—we note that, in any event, it would be unavailing in this case. Because J & J * Merck has failed to show that it has suffered any injury as a result of the challenged TUMS commercials, it cannot obtain relief under any theory of Lanham Act liability that is premised upon an implied falsehood.

## I. Liability for Implied Falsehoods

In relevant part, § 43(a) of the Lanham Act as amended provides:

> Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any ... false or misleading description of fact, or false or misleading representation of fact, which—
>
> ... is likely to cause confusion, or to cause mistake, or ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities ... of his or her or another person's goods, services or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a).

The law governing false advertising claims under the Lanham Act is well settled in this circuit. In order to recover damages or obtain equitable relief, a plaintiff must show that either: 1) the challenged advertisement is literally false, or 2) while the advertisement is literally true it is nevertheless likely to mislead or confuse consumers. See McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir.1991); Johnson & Johnson v. GAC Int'l, Inc., 862 F.2d 975, 977 (2d Cir. 1988); Coca–Cola Co. v. Tropicana Products Inc., 690 F.2d 312, 317 (2d Cir.1982); American Home Products Corp. v. Johnson & Johnson, 577 F.2d 160, 165 (2d Cir. 1978).

Where, as here, a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers. See GAC Int'l, Inc., 862 F.2d at 977; American Home Products Corp., 577 F.2d at 165; Upjohn Co. v. American Home Products Corp., 598 F.Supp. 550, 556 (S.D.N.Y.1984). It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive. Rather, as we have reiterated in the past, "[t]he question in such cases is—what does the person to whom the advertisement is addressed find to be the mes-

sage?" *American Home Products Corp.*, 577 F.2d at 166 (quoting *American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F.Supp. 1352, 1357 (S.D.N.Y.1976)). That is, what does the public perceive the message to be?

The answer to this question is pivotal because, where the advertisement is literally true, it is often the only measure by which a court can determine whether a commercial's net communicative effect is misleading. Thus, the success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey. *See Coca–Cola Co.*, 690 F.2d at 317 ("When the challenged advertisement is implicitly rather than explicitly false, its tendency to violate the Lanham Act by misleading, confusing or deceiving should be tested by public reaction."); *American Home Products Corp.*, 577 F.2d at 165; *Upjohn Co., supra.*

■ Where a district court's factual findings regarding an advertisement's tendency to mislead or confuse consumers are based "on its analysis of ... surveys [and] on the corroborating evidence of the market research experts," those findings are entitled to the clearly erroneous standard of review. *American Home Products Corp.*, 577 F.2d at 167. J & J * Merck does not dispute this. However, in attempting to show that the district court's findings on this point were clearly erroneous, J & J * Merck argues that Judge Cedarbaum failed sufficiently to consider factors other than consumer survey evidence, such as: 1) the general "commercial context" or sea of information in which consumers are immersed; 2) the defendant's intent to harness public misperception; 3) the defendant's prior advertising history; and 4) the sophistication of the advertising audience. This argument causes us some discomfort.

■ Appellant's criticism of the district court's findings misconstrues the proper role of consumer survey evidence in the analysis of implied falsehood claims. Generally, before a court can determine the truth or falsity of an advertisement's message, it must first determine what message was actually conveyed to the viewing audi-

ence. Consumer surveys supply such information. *Id.*, 577 F.2d at 166. "Once the meaning to the target audience has been determined, the court, as the finder of fact, must then judge whether the evidence establishes that they were likely to be misled." *Nikkal Indus., Ltd. v. Salton, Inc.*, 735 F.Supp. 1227, 1235 (S.D.N.Y.1990) (citing *McNeilab, Inc. v. American Home Products Corp.*, 501 F.Supp. 517, 525 (S.D.N.Y.1980)).

■ Three of the factors listed by J & J * Merck, i.e., commercial context, defendant's prior advertising history, and sophistication of the advertising audience, only come into play, if at all, during the latter part of the court's analysis. In a particular case, these factors may shed some light on whether the challenged advertisement contributed to the meaning that was ultimately gleaned by the target audience. In other words, in determining whether an advertisement is likely to mislead or confuse, the district court may consider these factors after a plaintiff has established "that a not insubstantial number of consumers," *Coca–Cola Co.*, 690 F.2d at 317, hold the false belief allegedly communicated in the ad.

■ Absent such a threshold showing, an implied falsehood claim must fail. This follows from the obvious fact that the injuries redressed in false advertising cases are the result of public deception. Thus, where the plaintiff cannot demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement, the plaintiff cannot establish that it suffered any injury as a result of the advertisement's message. Without injury there can be no claim, regardless of commercial context, prior advertising history, or audience sophistication.

However, we have held that "where a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public," and the defendant's "deliberate conduct" in this regard is of an "egregious nature," a presumption arises "that consumers are, in fact, being de-

ceived." *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.*, 926 F.2d 134, 140 (2d Cir.1991). This presumption which may be engendered by the expenditure "of substantial funds in an effort to deceive consumers and influence their purchasing decisions" relieves a plaintiff of the burden of producing consumer survey evidence that supports its claim. *Id.* (quoting *U–Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1041 (9th Cir.1986)). In such a case, once a plaintiff establishes deceptive intent, "the burden shifts to the defendant to demonstrate the absence of consumer confusion." *Resource Developers, supra.* J & J * Merck argues that this principle applies here. We are not persuaded.

■ The evidence of deceptive intent introduced at trial by J & J * Merck, which was controverted by defense witnesses, was comprised of certain conflicting Smithkline internal memoranda and related solely to the original Ingredients version of the TUMS commercial—the version that contained the "aluminum-free" slogan. No doubt, this evidence might have been used to establish Smithkline's deceptive intent in broadcasting the Ingredients commercial. However, as stated above, Smithkline withdrew Ingredients from the air, and that version of the commercial is not the subject of this action. In response to complaints lodged with Smithkline and the television networks by TUMS' competitors, the "aluminum-free" reference was dropped from the Ingredients ad. J & J * Merck introduced no additional evidence that the same "deceptive intent," which allegedly infected its production of the Ingredients commercial, informed the editing process that resulted in Ingredients–Revised. Judge Cedarbaum acknowledged that J & J * Merck "attempted to show that [a false message] was communicated through evidence of defendants' intent." Apparently, she found its attempt unavailing. In any event, given the indirect and controverted nature of the evidence regarding the intent behind the Ingredients–Revised advertisement, we are unwilling to extend the presumption of consumer confusion to this case.

## II. *The Bruno and Ridgway Survey*

At trial, J & J * Merck introduced the results of a consumer survey that it had conducted in conjunction with Bruno and Ridgway Research Associates, a marketing firm that conducts between 200–300 such surveys each year. According to Mr. Joseph Ridgway, the firm's president and J & J * Merck's expert witness, the survey was designed to assess what messages are communicated to consumers by Ingredients–Revised. In order to gain this information, 150 male and 150 female adult nonprescription antacid users were shown the commercial and interviewed in eight different shopping malls.

The aspects of the survey that are relevant to this appeal are those which concern the commercial's message regarding aluminum. Questions 8a and 8b asked: "Aside from trying to get you to buy the product, what are the main ideas the commercial communicates to you?" and "What other ideas does the commercial communicate to you?" Out of the 300 people surveyed, 18 people generally responded that "other antacids contain ingredients that are bad/harmful to you," only six of which specifically commented that "aluminum is not good for you." Two other responses were listed in the survey's tally as "aluminum is bad for brain/causes alzheimer's," and lastly, one additional response was recorded under the heading "miscellaneous negative aluminum comments." Questions 14a-c were asked of the 220 respondents who recalled Ingredients–Revised stating that MAALOX and MYLANTA contained aluminum and magnesium. They respectively inquired:

14a—What, if anything, does the commercial communicate to you about the aluminum and magnesium in Maalox and Mylanta?

14b—What else, if anything, does the commercial communicate to you about the aluminum and magnesium in Maalox and Mylanta?

14c—Based on the commercial you just saw, how do you feel about taking a product for heartburn that contains aluminum and magnesium?

Of the 220 people who responded to these questions, 83 answered with a comment classified as "not good for you/harmful/detrimental to your health." Three answered that aluminum causes Alzheimer's disease and, in addition, 38 responded that these ingredients are not needed by the body.

By adding up all negative comments made about either aluminum or magnesium in response to any of the survey questions, Mr. Ridgway concluded that Ingredients–Revised communicated to 45% of those surveyed that aluminum is either unhealthful or not good for you.

Smithkline and Jordan called Dr. Yoram Wind, a professor of marketing, as their expert witness to testify on nature of the messages communicated by Ingredients–Revised. Dr. Wind strongly criticized the Bruno and Ridgway study primarily on two grounds. First, he testified that, in his opinion, the survey was almost wholly comprised of leading questions. Second, he faulted the study for not taking into account the fact that respondents may have brought with them previously acquired information regarding calcium and aluminum, and for failing to adjust the survey accordingly. In his opinion, the study should have contained a control group— people who were asked similar questions that sought to elicit their beliefs regarding the safety of antacid ingredients, but who were not shown the challenged commercials beforehand.

█ The evidentiary value of a survey's results rests upon the underlying objectivity of the survey itself. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 118 (2d Cir.1984). This objectivity, in turn, "depends upon many factors, such as whether [the survey] is properly 'filtered' to screen out those who got no message from the advertisement, whether the questions are directed to the real issues, and whether the questions are leading or suggestive." *American Home Products Corp. v. Johnson & Johnson,* 654 F.Supp. 568, 590 (S.D.N.Y.1987); *see also Weight Watchers Int'l, Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1272 (S.D.N.Y.

1990) (listing 7 criteria for survey trustworthiness).

█ Judge Cedarbaum's analysis of the Bruno and Ridgway survey was wholly in keeping with these principles. After hearing testimony from the parties' experts, and reviewing the results of the study itself, she specifically found that the study "did not show that 'Ingredients–Revised' communicates that the aluminum ... in Mylanta is harmful or unsafe." In her view, the responses to questions 8a and 8b, which elicited only nine anti-aluminum reactions from the 300 people surveyed, were "the most persuasive evidence of the message communicated by 'Ingredients–Revised.'" She attributed this to the fact that questions 8a and 8b were "open-ended," and, therefore, more objective.

On the other hand, Judge Cedarbaum discounted the value of the 86 anti-aluminum/magnesium responses obtained from the 220 people who answered questions 14a-c on the grounds that those questions ranged from being "somewhat leading" to "very leading." Accordingly, she rejected Mr. Ridgway's calculation that Ingredients–Revised communicated an anti-aluminum message to 45% of those surveyed—a figure largely based upon answers received to questions 14a-c.

Citing a list of cases in which surveys employing "similar methodologies" have been credited, *see, e.g., McNeilab, Inc. v. American Home Products Corp.,* 675 F.Supp. 819, 825 (S.D.N.Y.1987), *aff'd* 848 F.2d 34 (2d Cir.1988); *McNeilab, Inc.,* 501 F.Supp. at 525–28; *U–Haul Int'l, Inc. v. Jartran, Inc.,* 522 F.Supp. 1238, 1249 (D.Ariz.1981), *aff'd,* 681 F.2d 1159 (9th Cir. 1982), J & J * Merck contends that the district court's characterization of questions 14a-c as "leading" was legally incorrect, and that the court overly relied on questions 8a and 8b. This argument is unpalatable.

The probative value of any given survey is a fact specific question that is uniquely contextual. While certain types of survey questions may be appropriate to discern the message of one advertisement, they may be completely inapposite with regard

to another. Thus, "it [is] in the district court's province as trier of fact to weigh the evidence, and in particular the opinion research." *American Home Products,* 577 F.2d at 167. After reviewing the record in this case, we conclude that Judge Cedarbaum's evaluation of the survey questions is not clearly erroneous.

J & J * Merck also argues that the district court erroneously adopted Dr. Wind's opinion regarding the necessity of a controlled study. It contends that, "[t]he object of Mr. Ridgway's survey, like any advertising communication test, was to measure the impact of an ad upon consumers *in the real world*—not in some artificial or 'control[led]' environment." This contention lacks merit for two reasons. First, Judge Cedarbaum drew no conclusion from the fact that the survey lacked a control; indeed, her legal discussion makes no mention of it whatsoever. Second, we find J & J * Merck's opposition to a control study at odds with its own proposed theory of Lanham Act liability, i.e., that liability exists for exploiting publicly held misperceptions even where the challenged advertising is literally truthful. In these types of cases, the purpose of a control study is to identify the portion of the survey population that held extrinsic beliefs prior to viewing an advertisement—for example, the unsubstantiated belief that aluminum causes Alzheimer's disease. Thus, a control would likely be indispensable proof in an action premised on J & J * Merck's theory. After all, without such evidence it would be hard to imagine how a plaintiff could ever convincingly establish that there was, in the first instance, a public misperception for the defendant to exploit.

Since J & J * Merck did not submit persuasive extrinsic evidence that the challenged TUMS' commercials communicated a false message to consumers by implication or otherwise, we cannot say the district court was clearly erroneous in rejecting it. Accordingly, its false advertising claims must fail.

## CONCLUSION

Based upon the literal message of the challenged commercials, and on the re-

sponses obtained from the consumer survey, the district court found that J & J * Merck failed to establish that commercials were either false or misleading. Upon review, we conclude that the district court's findings were not erroneous. Therefore, we affirm the district court's denial of injunctive relief, and its dismissal of J & J * Merck's complaint.

Affirmed.