**SMITHKLINE BEECHAM CONSUMER HEALTHCARE, L.P., Plaintiff,**

v.

**JOHNSON & JOHNSON–MERCK CONSUMER PHARMACEUTICALS COMPANY, INC., Defendant.**

**JOHNSON & JOHNSON–MERCK CONSUMER PHARMACEUTICALS CO., Plaintiff,**

v.

**SMITHKLINE BEECHAM CONSUMER HEALTHCARE, L.P., Defendant.**

Nos. 95 Civ. 7011 (HB), 95 Civ. 7688 (HB).

United States District Court,
S.D. New York.

Nov. 13, 1995.

Helene D. Jaffe, Weil, Gotshal & Manges, New York City, for SmithKline Beecham Consumer Healthcare, L.P.

Steven A. Zalesin, Patterson, Belknap, Webb & Tyler, New York City, for Johnson & Johnson–Merck Consumer Pharmaceuticals Co.

BAER, District Judge.

This is a consolidated action involving the advertising for over-the-counter heartburn medications. Smithkline Beecham Consumer Healthcare, L.P. ("SmithKline Beecham") is the maker of TAGAMET HB, and Johnson &

Johnson–Merck Consumer Pharmaceuticals Company, Inc. ("J & J–Merck") is the maker of PEPCID AC. They both seek preliminary injunctive relief under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1994). Each seeks to enjoin the other from the continued dissemination of certain advertisements alleged to be false and misleading.

On September 13 and 14, 1995, I conducted an evidentiary hearing in this matter. For the reasons which follow, each party's motion is granted in part and denied in part.

## I. *Background*

According to the parties, TAGAMET HB and PEPCID AC are part of a new generation of over-the-counter heartburn medications. Each drug works to relieve and/or prevent heartburn. Previously, the only over-the-counter medications available to counteract heartburn or acid indigestion were antacids such as TUMS, MAALOX or MYLANTA. Those three products each work by neutralizing stomach acid. In contrast, both TAGAMET HB and PEPCID AC contain $H_2$–receptor antagonists that work by blocking the production of stomach acid.

Prior to the Spring of 1995, TAGAMET HB and PEPCID AC were available only in their respective prescription forms; TAGAMET and PEPCID. TAGAMET HB is a reduced dosage form of the prescription drug TAGAMET. The active ingredient in both TAGAMET products is cimetidine. Cimetidine was introduced in 1977 as the first prescription $H_2$–receptor antagonist to reach the market. In its prescription form, TAGAMET is commonly used for the treatment of gastrointestinal disorders such as ulcers. On June 19, 1995 the Food and Drug Administration ("FDA") approved TAGAMET HB for over-the-counter sale.

Similarly, PEPCID AC is a reduced dosage form of the prescription drug PEPCID which was first introduced in 1986. Like TAGAMET, PEPCID is generally prescribed for the treatment of gastrointestinal disorders such as ulcers. Both PEPCID AC and PEPCID contain the active ingredient famotidine. Famotidine is an $H_2$–receptor antagonist, similar to cimetidine, and works to suppress the production of stomach acid. The FDA approved PEPCID AC for over-

the-counter sale in May of 1995, one month prior to approving TAGAMET HB.

Both TAGAMET HB and PEPCID AC are clawing their way up the ladder for a larger share of this immense and lucrative market. With the myriad of contentions and high degree of contentiousness exhibited by this litigation, one cannot help but ponder whether the words of Hippocrates, the Greek Father of Medicine, continue as a guide today in any meaningful way:

> I will use treatment to help the sick according to my ability and judgment but never with a view of injury or wrong doing .... I will keep pure and holy both my life and my art....

> Into whatever houses I enter I will go into them for the benefit of the sick, and will abstain from every voluntary act of mischief or corruption....

## II. *Discussion*

### a. *Legal Standards*

An application for preliminary injunctive relief seeks " 'an extraordinary and drastic remedy which should not be routinely granted.' " *Bruce v. Martin*, 680 F.Supp. 616, 620 (S.D.N.Y.1988) (quoting *Medical Soc'y of the State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir.1977)). The standard for reviewing a request for injunctive relief is well-settled. This Circuit recently reiterated the standard in *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272 (2d Cir.1995), and stated that the movant to prevail must prove:

> irreparable harm, and either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.

*Id.* at 1280 (citations omitted).

Through a host of orders and decisions enjoining false advertising claims, this Court has traditionally recognized the strong public policy against the dissemination of false and misleading advertising. *See generally Coca–Cola Company v. Tropicana Prods., Inc.*, 690 F.2d 312 (2d Cir.1982); *American Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d

160 (2d Cir.1978); *Johnson & Johnson v. GAC Int'l, Inc.,* 862 F.2d 975 (2d Cir.1988). This interest is particularly compelling where as here, the subject is over-the-counter drugs. *American Home Prods.,* 654 F.Supp. at 590.

The Lanham Act prohibits manufacturers from disseminating advertising which is false on its face as well as advertising which is literally true but, nevertheless, is likely to mislead and confuse consumers. The purpose of the Act is to insure that advertisements represent truthful claims by a manufacturer and to eliminate any advertising which proffers a misstatement or misrepresentation by a competitor. Section 43(a) of the Lanham Act provides in relevant part:

(1) Any person who, on or in connection with any goods or services, . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

\*   \*   \*   \*   \*   \*

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

■ To enjoin an ad under the Lanham Act, the claim must be material and likely to influence a consumer's purchasing decision. *See Skil Corp. v. Rockwell Int'l Corp.,* 375 F.Supp. 777, 782–83 (E.D.Ill.1974). A court may enjoin an ad which is explicitly or literally false " 'without reference to the advertisement's impact on the buying public.' " *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d Cir.1991) (citations omitted). A court may also enjoin an ad which is implicitly false, i.e. literally truthful but nonetheless misleading, only if the court can determine that the ad is confusing or deceiving, as tested by public reaction. *Coca–Cola Co.,* 690 F.2d at 317. Although an advertisement may be literally true, a Court may deem it false by necessary implication if

it is susceptible to more than one interpretation. *See Cuisinarts, Inc. v. Robot–Coupe Int'l Corp.,* 1982 WL 121559 at \*2 (S.D.N.Y. June 9, 1982); *Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 943–44 (3d Cir.1993) (holding an advertisement such as Pennzoil "outperforms any leading motor oil" was false by necessary implication).

■ This Circuit has held that "[i]t is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive. Rather, . . . [the relevant question is] what does the public perceive the message to be?" *Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 297–98 (2d Cir.1992). Accordingly, whether an advertising claim is misleading or not is generally determined by public reaction to a consumer survey or market research. *See, e.g., American Home Prods. Corp. v. Johnson & Johnson,* 436 F.Supp. 785, 792–95 (S.D.N.Y.1977), *aff'd,* 577 F.2d 160 (2d Cir.1978); *McNeilab, Inc. v. American Home Prods. Corp.,* 501 F.Supp. 517, 525 (S.D.N.Y.1980).

A full-blown survey need not be undertaken for a preliminary injunction; rather evidence such as an expert witnesses' testimony may be used to demonstrate the public's reaction to an ad. *Abbott Lab. v. Mead Johnson & Co.,* 971 F.2d 6, 15 (7th Cir.1992); *see also Smithkline Beecham,* 960 F.2d at 298; *American Home Prods.,* 436 F.Supp. at 792. "[A]ll that is required is a 'qualitative showing [to] establish that a not insubstantial number of consumers received a false or misleading impression from it.' " *McNeil–P.P.C., Inc. v. Bristol–Myers Squibb Co.,* 755 F.Supp. 1206, 1211 (S.D.N.Y.1990) (citation omitted), *aff'd,* 938 F.2d 1544 (2d Cir.1991).

■ Moreover, survey evidence need not automatically be accepted as dispositive; instead the value of a survey is only as good as the objectivity of the survey. *Smithkline Beecham,* 960 F.2d at 300. To assess the objectivity of a survey, a district court, as trier of the fact, must determine whether the survey was " 'properly "filtered" to screen out those who got no message from the advertisement, . . . whether the questions are

leading or suggestive.'" *Smithkline Beecham,* 960 F.2d at 300 (citations omitted). It is the district court's role to "weigh the evidence, and in particular the opinion research." *American Home Prods. v. Johnson & Johnson,* 577 F.2d at 167 (citation omitted).

◼ Advertising which makes an "establishment claim", a claim supported by a test or survey, will be found to be literally false if the test or survey relied upon is unreliable or does not in fact support the claim. *See Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 63 (2d Cir.1992) (stating that where the "defendant's ad explicitly or implicitly represents that tests or studies prove its product superior, plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited." (citation omitted)). Further, the District Court has previously stated that a disclaimer or contradictory claim placed in an ad will not remedy an ad, which is misleading, *per se. American Home Prods.,* 654 F.Supp. at 590. Usually disclaimers or contradictory claims appear in small sized print near the bottom of the document and either contradict, clarify or change the meaning of the main claim of the advertisement. The Court stated that a footnote or disclaimer that "purports to change the apparent meaning of the claims and render them literally truthful, but which is so inconspicuously located or in such fine print that readers tend to overlook it, will not remedy the misleading nature of the claims." *Id.* at 590 (citation omitted). Further, this Circuit determined in *Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 62 (2d Cir.1992), that false advertising which mentions a competitor's product by name presumptively causes irreparable harm to the named product's manufacturer. All that said, let's apply the legal principles to the claims here.

### b. *SmithKline Beecham's Claims*

SmithKline Beecham seeks to enjoin three of J & J–Merck's claims about PEPCID AC; (1) the "Controls Acid 9 Hours—All Day" Claim; (2) the "8 out of 10" Claim; and (3) the "No Drug Interaction Warnings" claim. SmithKline Beecham contends that each of these claims is false and/or misleading.

SmithKline Beecham asks that this Court enjoin J & J–Merck from making the following statements in its advertisements: (1) PEPCID AC controls acid for nine hours; (2) 8 out of 10 doctors recommend PEPCID AC more often than TAGAMET HB; and (3) PEPCID AC has no drug interaction warnings.

### 1. The "Controls Acid 9 Hours" Claim

◼ J & J–Merck ran print advertisements and television commercials which make the claim that PEPCID AC provides acid control for 9 hours, day or night. At the preliminary hearing, SmithKline Beecham did not object to J & J–Merck's claims as to PEPCID AC's ability to control acid for 9 hours at night but argued that J & J–Merck's claim that PEPCID AC controls acid for 9 hours during the day or "all day" is literally false. Because SmithKline Beecham claims that the "all day" claim is literally false, I must determine whether the scientific evidence provided by the parties proves the claim false on its face. *See McNeil–P.C.C., Inc.,* 938 F.2d at 1549 (citations omitted).

Although J & J–Merck graciously provided this Court with a number of studies relating to its night-time claim, they are not relevant here. J & J–Merck Exs. 2, 10, 11 and 17. SmithKline Beecham does not challenge J & J–Merck's "all night" claims. Moreover, the parties do not dispute that acid secretion during the day differs from that which occurs at night. Freston, Tr. 66–67; Wilson 196–97, 239–40 (fact that humans generally eat throughout the day effects the level of daytime acid secretions).

In contrast, the three studies which J & J–Merck provided regarding their claim of "all day" acid control are relevant. J & J–Merck Exs. 3, 12 and 14. Also relevant here is the testimony of Doctors Freston and Wilson. *See* Freston, Tr. 66–67; Wilson, Tr. 196–97, 239–40. Each of these three studies submitted by J & J–Merck relating to their "all day" claim demonstrate that the pH effect of PEPCID AC ended within nine hours after the study participants took a dose of the drug. Wilson, Tr. 239; J & J–Merck Ex. 338. Other studies indicate, however, that PEPCID AC does not begin to control acid for between an hour and an hour and a half

after a patient takes a dose of the medication. Freston, Tr. 69–70. At a minimum, PEPCID AC takes 40 minutes to begin working. Freston, Tr. 48 (Freston based his comments on interim data from J & J–Merck's fasted pH study). If you subtract the average time it takes for PEPCID AC to begin working from the overall time period during which the drug relieves heartburn symptoms, you come up with a period less than 9 hours. Wilson, Tr. 239 (stating that "By simple math, 9 minus 2 equals 7" hours of acid control once the drug begins working).

J & J–Merck argued that it should be allowed to use diary based relief studies to demonstrate PEPCID AC's onset of action control abilities. There was, however, compelling evidence that diary based relief studies do not accurately measure acid control, rather the only true way to measure acid control is "by placing a tube in the acid to directly sample the pH of the stomach contents or by pulling gastric juice back." Wilson, Tr. 189.

Consequently and in accordance with my October 13, 1995 Order, J & J–Merck is enjoined from disseminating on behalf of PEPCID AC: the "Woman Compares PEPCID to TAGAMET" and the "Control Acid 9 Hours" television commercials, until J & J–Merck conducts an appropriate study that supports its claims.[1] Similarly and in accordance with my Order, J & J–Merck is preliminarily enjoined, pending a final determination of this action from representing in any advertisement or promotional communication for PEPCID AC, that PEPCID AC controls acid "for 9 Hours" or for "all day," but this injunction does not bar J & J–Merck from advertising that PEPCID AC controls stomach acid "all night," "for nine hours at night," or "overnight," or equivalent claims.

### 2. The "8 Out of 10 Doctors Recommend PEPCID AC" Claim

▮ In both print and television advertisements J & J–Merck has claimed that "[w]hen doctors and pharmacists were asked which they would recommend more often, 8 out of 10 chose PEPCID AC Acid Controller over TAGAMET HB." J & J–Merck bases this claim on a June 1995 study conducted by Bruno & Ridgeway Research Associates. J & J–Merck Ex. 83; McDonald, Tr. 111, 114.

According to the testimony, this survey consisted of a researcher showing a one-page product profile[2] for both TAGAMET HB and PEPCID AC to a sample of 500 doctors and 300 pharmacists McDonald, Tr. 112. The researcher asked a series of questions regarding the doctors' or pharmacists' experience in recommending products to patients or customers for the treatment of heartburn. The survey further explored what doctors and pharmacists understood about patient and customer preferences in medications of this nature. *Id.* The survey also includes the following question: "All things considered, which one product, PEPCID AC or TAGAMET HB, if either, would you choose to recommend more often to patients suffering from heartburn or acid indigestion if both were available at prices you considered reasonable?" J & J–Merck, Ex. 83.

---

1. Throughout this Opinion, SmithKline Beecham or J & J–Merck is enjoined from the further dissemination of specific advertisements unless or until they conduct an appropriate study that supports their claims. In my Order the enjoined party seeking to lift the injunction may conduct an appropriate study which supports their claims and then provide "said study and proposed copy to this Court on 72 hours notice [to their adversary] ... to lodge any objections thereto, a conference or hearing may follow, if considered necessary by the Court, no action by the Court within 48 hours [following the 72 hour notice] ... will signal permission to proceed." *See generally*, Order of Hon. Harold Baer, Jr., *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson–Merck Consumer Pharmaceu-*

*ticals Company, Inc.,* 95 Civ. 7011, (S.D.N.Y. Oct. 13, 1995).

2. According to J & J–Merck's expert, Dr. Susan MacDonald, the product profiles used as the stimulus for the questions were intended to capture the "relevant attributes of the products that would be taken into account with physicians to decide whether or not to use it. Those profiles normally indicate level of efficacy, side effects, dose, that kind of thing." MacDonald, Tr. 112–13. At the time the survey was conducted, the FDA had not approved TAGAMET HB for over-the-counter sale, thus there was no labelling, etc. available for TAGAMET HB to make what one might conclude to have been a fairer stimulus or product profile. *Id.,* Tr. 114–15.

SmithKline Beecham produced an expert on survey research, Dr. Michael Rappeport, who testified that the one-page product profiles used by Bruno–Ridgeway were biased in favor of PEPCID AC. Rappeport, Tr. 151–52. Dr. Rappeport further testified that the timing of the survey was unfair because PEPCID AC had already been approved for over-the-counter sale by the FDA and was being launched as a new product in the marketplace while the FDA had not yet approved TAGAMET HB for similar sale. *Id.*

Dr. Darrell Abernethy, also a witness for SmithKline Beecham, testified that the profiles used by the researchers were biased in that (1) they suggested TAGAMET HB posed serious risks of drug interactions [3], and (2) omitted price information as well as information regarding the onset of action of both products which would aid doctors and pharmacists in making their choice. Abernathy, Tr. 259–61. Even Dr. Susan McDonald, J & J–Merck's expert, conceded that the stimulus used was not ideal, but that at the time the survey was conducted, J & J–Merck did not have sufficient information to create a more ideal stimulus. McDonald, Tr. 113–14.

When advertising claims are supported by survey data, I am to conclude after an analysis of testimony and exhibits if the survey is reliable or not. *See Castrol,* 977 F.2d at 63. I must further evaluate the survey itself and determine whether it is objective, eliminates those who did not understand the ad, and does not include leading or suggestive questions. *Smithkline Beecham,* 960 F.2d at 300 (citations omitted). Having evaluated the survey and analyzed the evidence as presented at the September hearing, I find that the June 1995 Bruno & Ridgeway survey was not conducted in an objective manner.

As a consequence and in accordance with the terms of my Order of October 13, 1995, J & J–Merck is enjoined, pending final determination of this action, from disseminating on behalf of PEPCID AC: the "8 Out of 10 Choose" television commercial, and from representing in any advertising or promotional communication that 8 out of 10 doctors and/or pharmacists recommend PEPCID AC more often than TAGAMET HB or from making any other doctor or pharmacist preference claim based on the June, 1995 Bruno & Ridgeway survey, unless or until J & J–Merck conducts an appropriate study that supports its claims.

### 3. J & J–Merck's Claim that PEPCID AC has no drug interaction warnings.

■■■ In several advertisements J & J–Merck claimed that PEPCID AC differs from TAGAMET HB in that, unlike TAGAMET HB, PEPCID AC has no drug interaction warnings. While SmithKline Beecham concedes that J & J–Merck's claim is true in that the FDA approved a label and a package insert for PEPCID AC which contain no warnings about the drug's interaction with other drugs, it argues that the way the claim is framed cannot help but communicate a false message to consumers, i.e., that PEPCID AC does not interact with other drugs at all. Rappeport, Tr. 161 (stating that a survey of persons who watched two commercials containing this claim responded to an open-ended question "that the main idea of the ad [is] that PEPCID [AC] has no drug interactions or doesn't interact with other drugs.").

Again, as stated above, because SmithKline Beecham is alleging that J & J–Merck has made a claim which is implicitly false, my role is to evaluate how consumers perceive this claim and whether they find that it conveys a false, confusing or misleading message. *Coca–Cola Co.,* 690 F.2d at 317. Further, as stated above, even if the advertisement is literally true, as may be the case here, I may deem it false by necessary implication if it is susceptible to more than one interpretation. *See Cuisinarts, Inc.,* 1982 WL 121559 at *2. Thus, as before, the relevant question here is what message does the

---

**3.** The FDA requires TAGAMET HB to list in its packaging that persons taking theophylline, warfarin, or phenytoin consult their doctor before taking TAGAMET HB. Product package insert, TAGAMET HB. SmithKline Beecham experts testified that they are more likely to recommend an over-the-counter drug which has no interactions with other prescription and non-prescription drugs over a drug with the similar effects but which does interact with other drugs. Abernathy, Tr. 259–60.

public perceive is conveyed by this ad. *Johnson & Johnson–Merck Consumer Pharmaceuticals Co.*, 960 F.2d at 297–98.

SmithKline Beecham provided three consumer surveys to this Court to substantiate their allegations. Two of the surveys were conducted by Tibor Weiss of AHF Marketing Research, Inc. ("Weiss surveys"). The Weiss surveys show that 25% of the total number of respondents to open ended questions after viewing the "8 out of 10" television commercial said that the commercial sought to inform consumers that PEPCID AC has no drug interactions or does not react or interact with any other drugs. Rappeport, Tr. 159–63; J & J–Merck, Ex. 56; SmithKline Beecham, Ex. 78. In like manner, 22% of the persons who answered similar questions after viewing the "Woman Compares PEPCID AC" commercial said that the commercial conveyed the same message. *Id.* Further, 8% of those polled stated that they interpreted the commercials to mean that PEPCID AC is safer than TAGAMET HB. SmithKline Beecham, Ex. 78.

I find that the survey evidence here fails to support the SmithKline Beecham claim. Accordingly, I do not enjoin J & J–Merck from claiming that unlike TAGAMET HB, PEPCID AC has no drug interaction warnings. However, I do enjoin J & J–Merck's dissemination of two print advertisements which include a claim that PEPCID AC is free of warnings about its use with prescription medications. Similarly, I enjoin J & J–Merck from disseminating the two television commercials referenced above, the "8 out of 10" commercial and J & J–Merck's "Woman Compares" commercial.

Consequently and in accordance with my October 13, 1995 Order, J & J–Merck is enjoined, pending final determination of this action, from disseminating on behalf of PEPCID AC the print advertisement "New PEPCID AC is Better than TAGAMET HB in Five Important Ways," and the print advertisement "Try it Free." Similarly, and in accordance with my Order, J & J–Merck is enjoined, pending final determination of this action, from disseminating on behalf of PEPCID AC the "8 Out of 10 Choose" television commercial and the "Woman Compares

PEPCID to TAGAMET" television commercial, unless or until J & J–Merck conducts an appropriate study that supports its claims.

#### c. *J & J–Merck's Claims*

At the preliminary hearing, J & J–Merck alleged that SmithKline Beecham made false and misleading advertising claims about PEPCID AC by stating that TAGAMET HB works faster than PEPCID AC. Specifically, J & J–Merck asks this Court to enjoin SmithKline Beecham from further disseminating (1) SmithKline Beecham's "Bar Chart" advertisement, and (2) SmithKline Beecham's "Onset of Action" claims.

#### 1. The "Bar Chart" Advertisement

In late August of this year, SmithKline Beecham began to publish in newspapers and magazines a print advertisement for TAGAMET HB which bears the following headline: "DOCTORS HAVE ALREADY ENDORSED TAGAMET IN THE STRONGEST POSSIBLE WAY. WITH THEIR PRESCRIPTION PADS." Beneath this headline appears a bar chart which shows that TAGAMET, the prescription form of TAGAMET HB, has been prescribed 237 million times. In contrast, PEPCID, the prescription form of PEPCID AC, has only been prescribed 36 million times. The text of the advertisement further states that doctors have written "over 200 million more prescriptions [for TAGAMET] than have been written for PEPCID." A footnote which appears in the lower corner of the advertisement and in considerably smaller type states: "TAGAMET prescriptions since 1977. PEPCID prescriptions since 1986."

J & J–Merck alleges that the statements in this advertisement imply that in a head-to-head comparison of the two products, physicians have overwhelmingly prescribed TAGAMET over PEPCID. In reality, however, PEPCID was not available as a prescription drug for most of the comparison period. Further, J & J–Merck alleges that the footnote at the bottom of the ad fails to avoid the misrepresentation which a consumer could and likely would infer from the text of the advertisement.

J & J–Merck argues that because this ad is literally false, I may enjoin the ad without reference to the ad's impact on the buying public under *McNeil–P.C.C., Inc.,* 938 F.2d at 1549 (citations omitted). In contrast, SmithKline Beecham contends that, at worst, this ad is not literally false but implicitly false, thereby requiring me to judge whether consumers find the ad misleading, confusing or deceiving, as tested by public reaction. *See, e.g., American Home Prods. Corp. v. Johnson & Johnson,* 436 F.Supp. at 792–95; *see also Coca–Cola Company,* 690 F.2d at 317; *McNeilab, Inc.,* 501 F.Supp. at 525.

I find that the ad conveys clearly and unequivocally the false message that doctors prescribed TAGAMET HB two hundred million times more than they prescribed PEPCID AC over an equal time period. Worse yet, the ad compares the number of prescriptions for TAGAMET and for PEPCID, not their over-the-counter counterparts even though it is the over-the-counter market at which the ad campaign is directed. To add to the acid indigestion engendered, the majority of the 237 million times in which doctors prescribed TAGAMET, they were prescribing the drug for the treatment of ulcers, not as a remedy for heartburn sufferers. Finally, the comparison is literally false because it does not compare the number of prescriptions over a similar time period, as noted by the small footnote at the bottom of the advertisement. As this Court has stated, a footnote or disclaimer "which is so inconspicuously located or in such fine print that readers tend to overlook it, will not remedy the misleading nature" of a claim. *American Home Prods. Corp. v. Johnson & Johnson,* 654 F.Supp. at 590 (citations omitted).

Consequently and in accordance with my Order of October 13, 1995, SmithKline Beecham is enjoined, pending final determination of this action, from disseminating on behalf of TAGAMET HB the "Bar Chart" advertisement and all advertising or promotional materials that contain the bar chart comparison. Similarly, and in accordance with my Order, SmithKline Beecham is enjoined, pending final determination of this action, from disseminating on behalf of TAGAMET HB the "In No Time, Heartburn" television

commercial and that TAGAMET has been prescribed more times than PEPCID, unless such advertisement compares the numbers of prescriptions during the time period in which both drugs have been on the market as prescription drugs or, alternatively, compares time periods during which both drugs have been on the market in their non-prescription form.

#### 2. The "Onset of Action" Claims

■ In the text of the bar chart enjoined above, it states:

... doctors and pharmacists will appreciate TAGAMET HB's onset-of-action for heartburn. PEPCID AC, on the other hand, can take one to two hours to start reducing stomach acid.

Text, "Bar Chart" Advertisement, J & J–Merck, Ex. 34. J & J–Merck asks that I enjoin SmithKline Beecham from further making this claim because it is false. Specifically J & J–Merck claims that PEPCID AC begins to work within 30 minutes and that TAGAMET HB does not have a faster onset of action than PEPCID AC.

To support their allegation that SmithKline Beecham's onset of action claims are false, J & J–Merck produced 2 expert witnesses and 2 clinical studies at the preliminary hearing. The first expert, Professor James Freston testified that there are three ways to determine how fast a heartburn medication begins to work; (1) a controlled "double blind" clinical trial; (2) an electronic probe measurement of the acidity (pH) of the stomach; and (3) a correlation study measuring "the concentration of the drug in blood and the degree of inhibition of acid in the stomach at any given moment." Freston, Tr. 21. Dr. Freston testified that the most reliable of these three, "the gold standard" as he called it, is the first type; controlled clinical studies. In a controlled "double blind" clinical trial, patients rate their subjective responses to the drug under study and to a placebo. *Id.*

J & J–Merck produced two clinical studies which compare PEPCID AC with an antacid and a placebo. Freston, Tr. 29–31; J & J–Merck, Exs. 4, 5, 316, 318, 322, 324. The results of one study showed that PEPCID AC relieves heartburn to a statistically sig-

nificant degree within 15 minutes, while the second study shows that PEPCID AC provides relief within 30 minutes. Freston, Tr. 31–33; J & J–Merck, Ex. 17. Professor Freston testified that the two studies show "that the drug [PEPCID AC] is clearly working in terms of beginning to relieve heartburn by half an hour and probably by 15 minutes." Freston, Tr. 31.

J & J–Merck's second witness, Professor Nan Laird reinforced Professor Freston's testimony and conclusions about the two studies. Laird, Tr. 96–97. Professor Laird testified that a combined analysis of the two tests enables her to conclude that there is only a two percent likelihood that the finding that PEPCID AC begins to relieve heartburn within half an hour is due to chance. Laird, Tr. 83, 92.

SmithKline. Beecham also proffered evidence to this Court on this subject. Specifically, SmithKline Beecham provided a 10 patient pH probe study in which PEPCID AC did not achieve a statistically significant difference in relief from the placebo until 1.7 hours after the relevant dosages were ingested. SmithKline Beecham, Ex. 51. As stated above, studies measuring the acidity or pH in the stomach are another way to determine the effectiveness of a drug. Professors Laird and Freston each criticized this study. Laird, Tr. 102–03; Freston, Tr. 80. Professor Laird claimed that in such a small study, the absence of a statistically significant difference does not prove that PEPCID AC was not working. Laird, Tr. 102–03 (testifying that "[y]ou can see statistically significant differences that aren't clinically meaningful."). Similarly, Professor Freston testified that data based on a pH probe study, like the one here, is not as reliable as data from symptom relief studies which show that the drug is actually providing relief to patients. Freston, Tr. 80.

Professor Freston further criticized the 10 patient study, by claiming that the absorption of the drug was delayed by the fact that the patients were fed a meal prior to ingesting the drug. Freston, Tr. 43–44. According to Professor Freston's testimony, eating a meal prior to ingesting the drug delays the rate at which the drug is absorbed into the bloodstream and obscures the effect of the drug because the meal acts as a buffer and raises the acidity level within the stomach. Freston, Tr. 43–44, 79–80. SmithKline Beecham's expert, Dr. Wilson similarly acknowledged the effect of a meal on drug absorption. Wilson, Tr. 218. Procedurally, let me say each of the experts came to the stand with extensive CV's and were articulate, credible witnesses.

SmithKline Beecham's ad claims that in comparison with TAGAMET HB, PEPCID AC can take one to two hours to start reducing stomach acid. Text, "Bar Chart" Advertisement, J & J–Merck, Ex. 34. SmithKline Beecham's Marketing Director of Prescription to Over the Counter switches, David Cook, testified that the intended message of this ad is that TAGAMET HB has a faster onset of action than PEPCID AC. Cook, Tr. 312. As stated by Professor Freston, the best way to determine which of two drugs has a faster onset of action is to compare the two directly in a head-to-head test under identical circumstances. Freston, Tr. 51.

Here, J & J–Merck presented this Court with results from three head-to-head studies comparing PEPCID AC to TAGAMET HB. J & J–Merck, Exs. 8, 10, 19, 20, 23, 305 & 314A. All of these studies conclude that PEPCID AC works at least as fast as TAGAMET HB in controlling the production of stomach acid and in relieving the symptoms of heartburn. SmithKline Beecham did not offer any head-to-head studies or other evidence comparing PEPCID AC and TAGAMET HB in terms of their onset of action abilities. However, their expert, Dr. Wilson testified that one of J & J–Merck's studies reported that TAGAMET HB had approximately a half hour faster onset of action than PEPCID AC. Wilson, Tr. 241–42. Dr. Wilson further stated, however, that he considered the way the researchers reported the data to be flawed. Id. Dr. Freston testified that a fasted study was the only proper way to test the two drugs in a head-to-head comparison because a meal consumed prior to ingesting a dose of either drug obscures any difference regarding the onset of action. Freston, Tr. 47. Based on this evidence, I find that SmithKline Beecham's claim that

TAGAMET HB has a faster onset of action than PEPCID AC is false.

Consequently and in accordance with my Order of October 13, 1995, SmithKline Beecham is enjoined, pending final determination of this action, from disseminating on behalf of TAGAMET HB all advertising or promotional materials that contain the claim that TAGAMET HB has a faster onset of action than PEPCID AC.

### 3. The TUMS Commercial.

J & J–Merck further asks that I enjoin a commercial for TUMS ULTRA antacid disseminated by SmithKline Beecham. The commercial claims that PEPCID AC "took over an hour to start working" while TUMS "starts working within seconds." At various times throughout the commercial a small typed message appears at the bottom stating that these claims are "based on pH data of stomach acidity."

J & J–Merck claims that this advertisement is false because PEPCID AC does not take over an hour to start working and TUMS does not start working in seconds. As I stated in the section above, J & J–Merck demonstrated to my satisfaction that PEPCID AC begins to work within half an hour, or within 15 minutes. *See* section 2 above. There is no need to repeat my analysis here and I therefore find that SmithKline Beecham's claim that PEPCID AC "took over an hour to start working" as contained in the TUMS commercial is false.

In terms of SmithKline Beecham's claim that TUMS starts working within seconds, I find that claim is also false. SmithKline Beecham provided me with clinical pH studies showing that when TUMS is added to gastric acid, it has an almost immediate effect on the pH level. SmithKline Beecham, Ex. 66 at 3899. Professor Freston criticized SmithKline Beecham's studies, claiming that the use of test tube experiments does not replicate the actual conditions in the human stomach. Freston, Tr. 21, 79–80. Professor Freston further testified that no antacid can begin to work to relieve heartburn within seconds. Freston, Tr. 52–53.

SmithKline Beecham provided me with two additional pH probe studies which compare the gastric effects of TUMS ULTRA with PEPCID AC. In a draft of one report, the researchers concluded that TUMS begins to raise stomach pH within 42 minutes, while in a revised version, researchers concluded that the median onset of action time for TUMS ULTRA occurred within 1.3 minutes. J & J–Merck, Ex. 82C2; SmithKline Beecham, Ex. 95. Based on this data, I conclude that although TUMS ULTRA may begin to work almost immediately, it clearly does not begin to work within seconds. For that reason, I am enjoining SmithKline Beecham from further disseminating the claim that PEPCID AC "took over an hour to start working" while TUMS "starts working within seconds" without further study.

Consequently and in accordance with my Order of October 13, 1995, SmithKline Beecham is further enjoined, pending final determination of this action, from representing in any advertisement or promotional communication on behalf of TUMS that TUMS starts working within seconds, but this injunction does not preclude SmithKline Beecham from advertising that, based on head-to-head tests of stomach pH, TUMS starts to work fast and faster than PEPCID AC and has a faster onset of action than PEPCID AC.

### III. *Conclusion*

Based on the evidence adduced at the evidentiary hearing in this matter, each party's motion is granted in part and denied in part.

**SO ORDERED.**