**JOHNSON & JOHNSON VISION CARE, INC., Plaintiff,**

**v.**

**CIBA VISION CORPORATION, Defendant.**

**No. 04CIV7369(LTS)(HBP).**

United States District Court, S.D. New York.

Dec. 10, 2004.

*OPINION AND ORDER*

SWAIN, District Judge.

Plaintiff Johnson & Johnson Vision Care, Inc. ("Plaintiff" or "JJVC") has brought the instant false advertising action pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), Sections 349 and 350 of the New York General Business Law, and the common law of unfair competition, to challenge promotional materials disseminated by Defendant CIBA Vision Corporation ("Defendant" or "CIBA") in connection with CIBA's launch of its $O_2$ OPTIX contact lenses. Plaintiff JJVC, a Florida corporation with its principal place of business in Florida, manufactures, markets and sells contact lenses, including ACUVUE ADVANCE and ACUVUE 2. Defendant CIBA, a Delaware corporation with its principal place of business in Georgia, and a competitor of JJVC in the contact lens market, develops, manufactures, markets and sells optical and ophthalmic products and services, including the $O_2$ OPTIX lens.

Plaintiff filed the complaint in the instant action on September 15, 2004, and moved on September 20, 2004, by application for an Order to Show Cause, for a preliminary injunction and an order permitting expedited discovery. At a conference held on September 22, 2004, the Court issued an order granting Plaintiff's request for expedited discovery and directing that the hearing on JJVC's motion for a preliminary injunction be consolidated with a trial on the merits of the action insofar as injunctive relief is sought.[1] The trial took place on October 18–21, 2004. The parties thereafter filed written closing arguments and proposed findings of fact and conclusions of law.

Kramer Levin Naftalis & Frankel LLP, By: Harold P. Weinberger, Jonathan M. Wagner, Norman C. Simon, Jeremy A. Cohen, New York, NY, for Plaintiff.

McDermott Will & Emery LLP, By: Charles W. Work, Kenneth L. Cage, Thomas P. Steindler, Robert W. Zelnick, Evan A. Parke, Raphael V. Lupo, Washington, DC and By: Chryssa V. Valletta, New York, New York, NY, for Defendant.

---

**1.** Such consolidation is authorized by Fed. R.Civ.P. 65(a)(2).

The Court has jurisdiction of Plaintiff's federal claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338, and of Plaintiff's New York state law claims under 28 U.S.C. §§ 1332, 1338(b), and 1367.

Plaintiff principally challenges three items of advertising material that were issued by CIBA in connection with the launch of the O₂OPTIX product: a two-page "sales aid" that was distributed to eye care professionals by CIBA's sales representatives (PX 2); a one-page "letter to Eye Care Professionals" that was included in packages of sample "fitting sets" of O₂OPTIX lenses (PX 3); and a one-page advertisement that was placed in professional journals (PX 4). These three items were introduced into evidence at trial. Following the trial, the parties proffered additional advertising materials. The Court declines to reopen the record. Accordingly, this decision addresses the matters that were raised at the trial.

The Court has considered thoroughly all of the parties' submissions and arguments; Plaintiff's application for a permanent injunction is hereby granted in part and denied in part, and Defendant's motion for judgment on partial findings is granted in part, for the reasons set forth below. This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## FACTS

### The Contact Lens Market

Contact lenses are medical devices designed to be worn on the eyes to correct vision problems. (Trial Tr. at 132.) Contact lenses, which are regulated by the FDA and cannot be acquired without a prescription from an eye care professional ("ECP"), are worn by approximately 35 million Americans. (*Id.*)

There are two major categories of contact lenses: rigid lenses, which are relatively firm pieces of plastic worn on the front of the eye that require precise fitting, and soft lenses, or hydrogels, which are essentially gels combined with water. Soft lenses are by far the more widely used lenses in the marketplace today. (*Id.* at 133.)

Soft lenses were introduced in the United States in the early 1970's and represented a significant technological advance over rigid lenses, offering increased benefits in terms of oxygen permeability and comfort. Soft lenses are also easier to fit than rigid lenses. (*Id.* at 137.) Soft lenses can be worn on either a daily wear or extended wear basis. Daily wear lenses are not designed to be worn during sleep, and therefore are intended to be removed each night. They are also intended to be cleaned and disinfected between scheduled replacements. (*Id.* at 43, 133.) Extended wear lenses can be worn overnight, and can be left in place for a continuous period of time ranging from one to thirty days, depending on the particular product. (*Id.* at 133.)

Oxygen supply to the cornea is an important factor bearing on ocular health. Hypoxia is "a relative lack of oxygen compared to that which would normally exist." (*Id.* at 41.) The cornea does not receive oxygen through blood vessels and thus relies almost entirely on oxygen received through the atmosphere (during sleep, the cornea relies mostly on oxygen received through the eyelid). Therefore, when wearing a contact lens, the eye only receives oxygen through the lens itself and, to a relatively small degree, through lens movement associated with blinking. Contact lenses are thus capable of interfering with the oxygen supply to the cornea, the

degree of interference depending on the oxygen transmissibility level of the particular lens. When the cornea does not receive sufficient oxygen, it becomes acidified and therefore has to do more work, thereby increasing its need for oxygen. (*Id.* at 488–89, 525.)

Oxygen transmissibility, as relevant to the instant dispute, is a measurement of the amount of oxygen that would pass through a particular contact lens (*id.* at 44), and is expressed as a number representing the ratio of a lens' permeability ("Dk") to its thickness ("t" or "L") ("Dk/t" or, less commonly, "Dk/L"). (*Id.* at 46–47.)

In 1999, JJVC introduced ACUVUE 2, which is a traditional hyrdogel lens that has been approved for both daily and extended wear, although it is marketed only for daily wear. It is still on the market today and has a Dk/t of 26. (*Id.* at 139–41.)

In recent years, it has become possible for polymer chemists to increase the oxygen permeability of soft lenses by adding silicone-bearing polymers. Both JJVC's ACUVUE ADVANCE with Hydraclear ("ACUVUE ADVANCE") and CIBA's $O_2$ OPTIX are examples of silicone hydrogels. (*Id.* at 42–43.) ACUVUE ADVANCE, which is approved for daily wear, was launched nationally in 2004 and has a Dk/t of 86. $O_2$OPTIX, which was launched in September 2004, as a daily wear lens but has more recently been approved for extended wear use, has a Dk/t of 138.

### The Challenged Promotional Materials

Around the time of the launch of its $O_2$ OPTIX lens, CIBA began distributing the challenged promotional materials to sales representatives for use in marketing the $O_2$OPTIX lens primarily to ECPs. The promotional materials consisted of a sales aid, a marketing letter, and a launch ad-vertisement. (Trial Tr. at 231, 288–93; PX 2; PX 3; PX 4.)

### The Sales Aid

At the top of page one of CIBA's two-page sales aid are the words "Introducing new $O_2$OPTIX." Directly below that is a statement that "A healthy cornea requires oxygen. Lots of it." Below the statement are several bullet points indicating that "[s]oft contact lenses create a barrier to the natural flow of oxygen to the cornea," that "[l]ack of sufficient oxygen can create a cumulative hypoxic stress on the cornea," and that "[t]his can be described as corneal oxygen deficiency." Under the bullet points is a bar graph depicting percentages of patients reporting various symptoms related to corneal oxygen deficiency, such as redness, blurriness/haziness of vision, eye irritation when wearing contacts, eye discomfort at the end of the day and dry eyes. To the right of the graph are several more bullet points under the heading "Clinical Signs of Corneal Oxygen Deficiency May Include." Signs mentioned are conjunctival and limbal injection, neovascularization, endothelial polymegethism, pleomorphism, and decreased cell density, refractive error, corneal staining and corneal edema. (PX 2.)

In the middle of page one of the sales aid are the words "New $O_2$OPTIX—the healthy choice for daily wear." Directly below that are the words "[o]xygen transmissibility (Dk/t) is a critical success factor for healthy contact lens wear." The sales aid further asserts that "[a] revolutionary silicone hydrogel technology gives $O_2$OPTIX," *inter alia*, "[a] Dk/t of 138@–3.00D, far exceeding the critical minimum threshold of 90 Dk/t to avoid severe hypoxic stress with daily wear." A footnote at the end of the statement regarding Dk/t levels cites a 1996 article by Ostrem, Fink and Hill entitled "A hypoxic response line model for the human cornea," (the "Hill

Article"). Near the bottom of page one of the sales aid are the words "O$_2$OPTIX provides 62% greater oxygen transmissibility than ACUVUE ADVANCE—and more than 5 times the oxygen of ACUVUE 2." Below that statement, at the very bottom of page one of the sales aid, is a bar graph, labeled "Critical Oxygen Transmissibility," that compares the oxygen transmissibility, or Dk/t, of four lenses— CIBA's Night & Day (Dk/t of 175), CIBA's O$_2$OPTIX (Dk/t of 125), JJVC's ACUVUE ADVANCE (Dk/t of 86), and JJVC's ACUVUE 2 (Dk/t of 26). The graph includes two horizontal dotted lines. The first dotted line, set at 125 Dk/t, is labeled "critical minimum for no stromal anoxia during overnight wear," and is footnoted to a 1996 article by Harvitt and Bonanno entitled "Reevaluation of the oxygen diffusion model for predicting minimum contact lens Dk/t values needed to avoid corneal anoxia." The second dotted line, set at 90 Dk/t, is labeled "critical minimum to avoid severe hypoxic stress with daily wear." (*Id.*)[2] CIBA's Night & Day and O$_2$OPTIX lenses thus are both depicted as having Dk/t's above both "critical minimums," while JJVC's ACUVUE ADVANCE and ACUVUE 2 lenses are both depicted as having Dk/t's that are below both "critical minimums."

Page two of the sales aid begins with the legend "[t]he oxygen your patients need and the comfort they want." The following text appears immediately below the legend:

75% of lens wearers preferred O$_2$OPTIX to ACUVUE ADVANCE.*

The # 1 reason was comfort.[4]

*In a double-masked, randomized clinical study where all patients wore both lenses.

Footnote four of the text is found in a block at the bottom of the page, and reads: "CIBA Vision. Data on file." (PX 2.)

*The Marketing Letter*

The marketing letter is a piece of correspondence from CIBA's Director of Professional Marketing, Dwight H. Akerman, addressed to "Eye Care Professional[s]," announcing the launch of O$_2$OPTIX. (PX 3.) The second paragraph of the letter asserts that "[a]n ever increasing body of clinical research demonstrates that maximizing the amount of oxygen transmissibility helps to minimize the signs and symptoms of corneal oxygen deficiency, which are so prevalent among wearers of low Dk/t disposable type contact lenses." The letter enumerates some "[c]linically observed signs" of corneal oxygen deficiency, such as corneal staining, neovascularization, and myopic creep, and states that some common symptoms are end of the day dryness, discomfort, blurred or fluctuating vision and conjunctival redness. The letter includes an assertion that 90 Dk/t is a significant level of oxygen transmissibility: "O$_2$ OPTIX has a remarkable oxygen transmissibility of 138 Dk/t—5X greater than the leading two week disposable type lens and well above the minimum standard of 90 Dk/t proposed by Ostrem, Fink and Hill to reduce the risk of severe corneal hypoxic stress during daily lens wear." (*Id.*)

*The Launch Ad*

The launch ad consists of a photograph accompanied by text. The top half of the ad is a photograph of a man working at a computer in a dark office. A person wear-

---

**2.** Although the 90 Dk/t line is not footnoted to indicate the source of the claim that 90 Dk/t is the "critical minimum to avoid severe hypoxic stress with daily wear," it is clear from the trial evidence and the parties' post-trial submissions that CIBA's representations regarding the significance of 90 Dk/t are all based on the Hill Article.

ing a white lab coat is standing a few feet behind him holding up a large sign that says, "TAKE OUT YOUR LENSES." (PX 4.) The text in the bottom half of the piece begins " ... or wear $O_2$OPTIX[.] The better way to help protect your patients' eyes—however long they wear their lenses each day." The text continues with the words, "Introducing new $O_2$OPTIX, the healthy choice for daily lens wear." The remainder of the text includes the statements "[o]xygen transmissibility is a critical success factor for healthy contact lens wear. Made with a revolutionary silicone hydrogel technology, $O_2$OPTIX provides more than 5 times the oxygen of ACUVUE 2," and "[t]his higher level of oxygen transmissibility helps protect patients from signs and symptoms of corneal oxygen deficiency." (*Id.*)

*CIBA's Claim that 90 Dk/t is a "Critical Minimum"*

CIBA predicates its statement in the $O_2$ OPTIX promotional materials that 90 Dk/t is a "critical minimum to avoid severe hypoxic stress with daily wear" on the Hill Article.[3] (PX 2; PX 13.) The article, which was published in the British Journal of Optometry and Dispensing, describes the results of a study of corneal oxygen uptake rates following periods of oxygen deprivation, conducted in the laboratory of one of the authors, Dr. Richard Hill, in the mid–1990's. (PX 13; *see also* Tr. of Oct. 13, 2004, Dep. of Richard M. Hill, O.D. ("Hill Tr.") at 22.)

The published abstract accompanying the Hill Article states that "[w]hen rates of oxygen uptake following periods of deprivation are relativized for all corneas to the same performance references, a pattern of hypoxic recovery emerges," and describes the study as proposing a model that "is highly predictive ... of oxygen uptake re-

covery rates associated with the very low and moderate [contact lens oxygen] transmissibility conditions." The abstract further states that "[p]ilot findings indicate that trends away from that recovery model can be detected for hypoxic conditions associated with a transmissibility level of 90 [Dk/t] ... but even at that [Dk/t] level, responses were not yet statistically different from extrapolated ... predictions." The abstract concludes with a statement that "[t]hese observations support the continuing search for, and the valid application of, higher transmissibility prescriptions for the purpose of further reducing hypoxic stress associated with all modes of contact lens wear." (PX 13.)

The text of the Hill Article states that the model being presented "provides a performance baseline against which contact lens transmissibility can be evaluated, in particular for whether a departure from the maximum recovery slope response pattern associated with low to moderate Dk/[t] levels has been achieved." The Hill Article includes a graph, labeled as Figure 1, representing the "Hypoxic Response Line model." Relative corneal response to hypoxia is measured on the y-axis, while Dk/t is measured on the x-axis. The graph shows six data points: five of them represent lenses with "low-to-moderate transmissibility" (50 Dk/t or below) and one represents a lens with a higher Dk/t level (90). The 90 Dk/t data point is shown to deviate from the line model. The graph does not include data points for lenses with Dk/t levels between 50 and 90, or above 90. (PX 13; Hill Tr. at 24.) Discussing the data points used and the relationship of results to the projected linear oxygen response model, the Article characterizes 90 Dk/t as an "example" of a

---

3. Eric D. Ostrem, Barbara A. Fink and Richard M. Hill, *A hypoxic response line model for* *the human cornea,* Br. J. Optom. Disp.1996; 4:53–55.

"transmissibility level which evokes a response which is clearly trending away (reflecting less hypoxic stress) from the maximum slope response predicted by this model, but whose difference is not yet statistically significant." The statistical significance conclusion, and the distinction between the study's findings as to responses to Dk/t levels of 50 and below and the finding at the Dk/t 90 data point, are reiterated in a "Key Points" box at the end of the article, which reads:

- Corneal oxygen uptake rates to low and moderate lens transmissibilities (up to [50Dk/t] ... ) form a predictable response pattern, called here the *Hypoxic Response Line*. Its equation can be used as a base line for testing departures (trend, or statistical) from that low transmissibility recovery pattern.

- When a transmissibility (Dk/L level) of [90] ... was compared with the *Hypoxic Response Line* model, a trend away from the rate it predicted (toward a lower, or less radical response slope) was noted. But even at that Dk/L level, a statistically significant departure could not yet be demonstrated. This outcome indicates that lens transmissibilities of greater than [90] ... are still a desirable objective for both the clinician and industry to pursue.

(PX 13 (emphasis in original).)

In the discussion section of the article, the authors state that "[t]he ultimate intent of [the] model is to identify ... that minimum transmissibility level at which the cornea first departs from an oxygen uptake pattern characteristic and highly predictive of more severe hypoxic conditions. Pilot observations here indicate that level to be greater than [90 Dk/t]." The authors also note that "the strong response trend observed here" supports

another model proposed by Holden and Mertz that advocated a minimum transmissibility level of 87 Dk/t for overnight wear. (PX 13.) Dr. Hill testified (in a videotaped deposition that was presented at trial), however, that

> [W]e didn't have points just below 90—like 80, 70, 60—and we didn't have points just above—like 100, 120, 130. Had we had those at that time, we would have known what the 90 point was doing, what it was about.

(Hill Tr. at 24.) According to Dr. Hill, the 90 Dk/t data point was included in the study rather arbitrarily, and would not have even been in the study but for the fact that, at that time the study was conducted, there "was a fairly new material [that] allowed [the research team] to look out there and see what was happening" at that particular point. (*Id.* at 22.) Dr. Hill stated that in the 1996 study, "[w]e only saw the 90 point. And that was our minimum observation for seeing this [aerobic] departure occur. That's why the word 'minimum' came into it, and ... We assumed there were—there were points down below there that were even more minimal." (*Id.* at 26.) Thus, Hill stated, he and his co-authors "purposefully in a pilot one-point observation did not use terms like 'threshold' or even try to suggest terms like 'threshold' or 'critical minimum' or 'standard.'" In fact, the very purpose of the dashed line on Figure 1 of the Hill Article (depicting a deviation from the predicted oxygen uptake curve indicative of hypoxic stress), Dr. Hill pointed out, was to convey "that there were other points down the way that share the non-statistical separation (seen at 90 Dk/t), [although they] hadn't seen them yet." (*Id.* at 88–89, 93.) Dr. Hill explained credibly that further research, following publication of the 1996 article, indicated that corneal response to a Dk/t of 90 is in an "aerobic,"

or "fairly oxygen-rich" environment that is discernable from approximately Dk/t 50, and that "[o]nce we saw the whole story, 90 was just a point on the continuum, not a particularly distinctive point." (*Id.* at 25–27.)

In April 2004, CIBA contacted Dr. Hill, seeking permission to use an adaptation of the Article's Figure 1 and an accompanying text in its $O_2$OPTIX advertising. Dr. Hill approved certain text to be used in conjunction with, and as a caption to, a graph or figure that was very similar to Figure 1 of the Hill Article. (Hill Tr. at 41.) The text approved by Dr. Hill states: "[t]his graph illustrates a predictive model of the cornea's sensitivity to oxygen availability under short term, open eye conditions. Observations from this study indicate that a Dk/t level greater than 90 ... is needed as a minimum for open eye (daily wear) to avoid ... severe corneal hypoxic stress." (PX 11B–F; Hill Tr. at 83.)

CIBA ultimately did not use the Article's Figure 1 or any graph similar to it in the challenged $O_2$OPTIX advertising materials. Rather, as indicated above, CIBA depicted 90 Dk/t as a "critical minimum to avoid severe hypoxic stress" on a graph illustrating the Dk/t ratings of two CIBA products and two JJVC products. Dr. Sally Dillehay, CIBA's head of academic development and director of medical marketing and clinical claims, determined that it was appropriate to characterize the 90 Dk/t level as a "critical minimum" based on her own analysis of the text of the Hill Article. Dr. Hill was not asked to approve the text used in the advertising that is at issue here. (Trial Tr. at 287, 302, 400–02.)

In mid-September 2004, following the launch of the $O_2$OPTIX campaign, Dr. Brian Pall, a JJVC employee who was a former graduate student of Dr. Hill, contacted Dr. Hill to inquire about CIBA's reference to the Hill Article in CIBA's $O_2$ OPTIX promotion materials. (Hill Tr. at 14.) Dr. Hill responded that neither he nor Dr. Fink, another of the study's authors, had seen the advertisements and asked that the promotional materials be forwarded to them. After receiving the promotional materials, Drs. Hill and Fink wrote a letter to CIBA, dated September 27, 2004, expressing concern that the Hill Article was not "cited and represented accurately" in the CIBA advertising, pointing out specifically that the Hill Article did not employ the phrase "... the critical minimum threshold of 90 Dk/t ...," or use the phrase "critical minimum" in reference to the underlying data. Fink and Hill also challenged the use of the phrase "the minimum standard of 90 Dk/t" in CIBA's letter to Eye Care Professionals, denying that they had " 'propose[d]' a 'standard' of any sort" in the article. (PX 11I.) Drs. Hill and Fink withdrew their "previous approval and support for use of the caption materials ... which were proposed by CIBA Vision this past April." (*Id.*)

*CIBA's Comfort Preference Claim and the CIBA Preference Study*

CIBA's claims in its sales aid that "75% of lens wearers preferred $O_2$OPTIX to ACUVUE ADVANCE," and that "[t]he # 1 reason was comfort," are based on a clinical study conducted by CIBA. (PX 10; Trial Tr. at 417.) CIBA asserts in the sales aid that the preference study was "a double-masked, randomized clinical study where all patients wore both lenses."

JJVC contends that the referenced study was not in fact "double masked," in that the lenses used bore markings that might have enabled participants to distinguish between the two brands of lenses and identify their manufacturer(s), and that the study was unreliable due to affiliation with CIBA of many of the partici-

pants. The trial evidence established the following material information with respect to the study, which was conducted from January 6 to February 27, 2004 (the "2004 CIBA Study").[4] The 2004 CIBA Study had twenty-two participants at the outset. Each participant wore an O$_2$OPTIX lens in one eye and an ACUVUE ADVANCE lens in the other, and was to make direct comparisons between the two lenses (CIBA terms this a contralateral study). (Trial Tr. at 418.) CIBA contends that neither the clinician conducting the study nor the subjects knew which manufacturer's lens was being worn in which eye. (*Id.* at 418–19.) The ACUVUE ADVANCE lenses were, however, marked with a small inversion indicator (the numbers "1, 2, 3"), and the O$_2$OPTIX lenses were marked with a tool code that was even smaller than the ACUVUE inversion indicator. (*Id.* at 427–28.)

CIBA originally planned that all twenty-two participants would wear the lenses for four weeks, with the lenses replaced bi-weekly, but the protocol was later changed so that thirteen of the participants wore the lenses they received at the two-week interval for an extra two weeks. (PX 10 at CIBANY 000818.) Two of the participants stopped participating at the two-week interval. (*Id.* at 000821.) Fourteen of the study's original twenty-two participants were employees of CIBA at the time the study was conducted, and two more had either a prior or a current affiliation with CIBA, although they were not directly employed by CIBA at the time of the study. (*Id.* at 422.)

CIBA's claim that 75% of lens wearers in the study preferred O$_2$OPTIX to ACUVUE ADVANCE is predicated on the results of a "forced choice" survey item in which each participant was required to identify which of the two lenses he or she preferred overall. Participants were required to select one lens over the other, and were not given the option of expressing no preference. Participants were asked to respond to that item at various points—at the time the lenses were dispensed, at the one-week interval, at the two-week interval, at the four-week interval, and again at the six-week interval. CIBA's preference claim in the O$_2$OPTIX promotional materials is based solely on the responses given at the four-week interval, when fifteen of the twenty participants remaining in the study chose O$_2$OPTIX. This result was statistically significant.[5] However, seven of those respondents—five of whom chose O$_2$OPTIX and two of whom chose ACUVUE ADVANCE as their overall preference at the four-week interval—picked "randomly selected" as the primary reason for their overall preference choice. (*Id.* at CIBANY 000842.) Dr. John McNally, CIBA's head of research and development for extended wear silicone hydrogel products and one of the designers of the study at issue here, testified during his deposition that he thought that, when subjects chose "randomly selected," it meant that "they basically said this one or that one. So probably in their mind they were about equal." (Trial Tr. at 468.) This candid assessment of the data is also

---

4. During the course of discovery, as well as during the trial, the parties agreed to designate confidential certain information (including testimony and a detailed report concerning the preference study) relating to their products, internal decisionmaking, research and policies. The Court has been careful, in this Opinion, to keep to the necessary minimum any discussion of the details of such information.

5. Although more subjects also favored O$_2$OPTIX than ACUVUE ADVANCE at the one-week, two-week, and six-week intervals, those results were not statistically significant. (PX 10 at CIBANY 000841.)

the logical interpretation of the responses to the preference query. The data indicate that only 10 subjects actually *preferred* O$_2$OPTIX to ACUVUE ADVANCE, while 3 preferred ACUVUE ADVANCE and 7 thought the lenses were about equal. The Court therefore finds that the 2004 CIBA Study data do not show that 75% of the study's participants actually expressed a preference for O$_2$OPTIX over ACUVUE ADVANCE.

CIBA's claim that the "# 1 reason" that the lens wearers who participated in the 2004 CIBA Study preferred O$_2$OPTIX to ACUVUE ADVANCE was "comfort" is predicated on the results of another forced choice survey item, in which each participant was required to indicate the primary reason for his or her overall preference choice. Eight of the respondents who had expressed a preference for O$_2$OPTIX picked comfort as the primary reason, while none of the participants who preferred ACUVUE ADVANCE cited comfort as the primary reason.

Although CIBA maintains that its principal reason for conducting the study was to determine which lens the subjects preferred overall, CIBA also measured a number of other variables related to contact lens wear, including several relating to comfort. The study also included a forced-choice preference item in which participants were required to indicate which of the two lenses they preferred from the perspective of comfort. The results of these items were not statistically significant. (Trial Tr. at 422–23; PX 10 at CIBANY 000836–40.)

### DISCUSSION

Plaintiff JJVC seeks to enjoin CIBA's promotional campaign relating to its O$_2$OPTIX contact lenses on the ground that

CIBA has made three literally false claims. First, Plaintiff argues that CIBA's claim that 90 Dk/t is a "critical minimum to avoid severe hypoxic stress with daily wear" is false because it is not supported by the Ostrem, Fink and Hill study that is cited in the promotional materials or by other authoritative literature on the subject. Second, Plaintiff argues that CIBA's claims that 75% of lens wearers in a double-masked, randomized clinical study preferred O$_2$OPTIX to ACUVUE ADVANCE 2, and that the "# 1 reason" for the preference was comfort, are literally false on the ground that the CIBA study used to support these claims was not sufficiently reliable. Finally, Plaintiff contends that CIBA is making a false general claim that O$_2$OPTIX is superior to the ACUVUE lenses in terms of its effect on overall ocular health.

■ Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a) (West 2004), provides, in relevant part, as follows:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—...

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C.A. § 1125(a)(1)(B) (West 2004). Generally, to establish a false advertising claim under Section 43(a) of the Lanham Act,[6] a plaintiff must prove the following

---

**6.** Because the standards for analysis of Plaintiff's New York state law claims are the same

elements: 1) the defendant has made a false or misleading statement; 2) the false or misleading statement has actually deceived or has the capacity to deceive a substantial portion of the intended audience; 3) the deception is material in that it is likely to influence purchasing decisions; 4) there is a likelihood of injury to plaintiff, such as declining sales or loss of goodwill; and 5) the goods traveled in interstate commerce. *See Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310–11 (1st Cir.2002); *Omega Engineering, Inc. v. Eastman Kodak Co.*, 30 F.Supp.2d 226, 255 (D.Conn.1998); *Autoinfo, Inc. v. Hollander Publ'g Co., Inc.*, No. 90 Civ. 6994(JSM), 1991 WL 64190, at *4 (S.D.N.Y.Apr.17, 1991).

■ "To obtain permanent injunctive relief against a false or misleading advertising claim pursuant to section 43(a), a plaintiff must demonstrate by a preponderance of the evidence that an advertisement is either literally false or that the advertisement, though literally true, is likely to mislead and confuse consumers." *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1548–49 (2d Cir.1991). "Additionally, a plaintiff must show that it will suffer irreparable harm absent the injunction." *Id.* at 1549.

■ Plaintiff asserts that all of CIBA's challenged claims are literally false. Under the literal falsity theory, a plaintiff must show that the challenged advertisement is "false on its face or 'explicitly false.'" *Novo Nordisk A/S*, 997 F.Supp. at 473 (internal citation omitted). "Where the advertising claim is shown to be literally false, the court may enjoin the use of the claim 'without reference to the advertisement's impact on the buying pub-

lic.'" *McNeil–P.C.C., Inc.*, 938 F.2d at 1549 (internal citations omitted). The standard to be applied "depends on the language of the advertisement." *Glaxo Warner–Lambert OTC G.P. v. Johnson & Johnson Merck Consumer Pharmaceuticals Co.*, 935 F.Supp. 327, 329 (S.D.N.Y. 1996). When the challenged advertisement relies either implicitly or explicitly on scientific studies (an "establishment claim"), "the plaintiff bears the burden of showing that 'the tests referred to ... [are] not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited.'" *Id.* (quoting *McNeil–P.C.C., Inc.*, 938 F.2d at 1549). When an advertisement is not explicitly premised on scientific evidence, the burden is on the plaintiff to "adduc[e] evidence that affirmatively shows the claim to be false." (*Id.*)

■ In addition, JJVC asserts that the comparative health superiority claim CIBA is making is also impliedly false. (*See* Pl's Proposed Findings of Fact and Conclusion of Law at 40.) Under the implied or "likely to mislead or confuse" theory, "a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers." *Johnson & Johnson* * *Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir.1992). According to the Second Circuit,

[i]t is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive. Rather, as we have reiterated in the past, '[t]he question is such cases is—what does the person to whom

---

as those for analysis of the Lanham Act claims in all relevant respects, the following discussion is equally applicable to both sets of claims. *See Tommy Hilfiger Licensing, Inc. v.*

*Nature Labs, LLC*, 221 F.Supp.2d 410, 413 n. 2 (S.D.N.Y.2002); *Novo Nordisk A/S v. Becton Dickinson and Co.*, 997 F.Supp. 470, 472 n. 1 (S.D.N.Y.1998).

*the advertisement is addressed find to be the message?'"*

*Id.* at 297–98 (internal citations omitted) (emphasis in original). Therefore, "the success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey." *Id.* at 298. However, "'where a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public,' and the defendant's 'deliberate conduct' in this regard is of an 'egregious nature,' a presumption arises 'that consumers are, in fact, being deceived,'" and the burden shifts to the defendant to demonstrate an absence of consumer confusion. *Id.* at 298–99 (quoting *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.,* 926 F.2d 134, 140 (2d Cir.1991)).

*Plaintiff's Contention that CIBA's Claim that 90 Dk/t is a "Critical Minimum" Is False*

█ As noted above, CIBA asserts in its sales aid that O₂OPTIX has a Dk/t "far exceeding the critical minimum threshold of 90 Dk/t to avoid severe hypoxic stress with daily wear." The sales aid includes a bar graph indicating that CIBA's Night & Day and O₂OPTIX have Dk/t levels above the 90 Dk/t critical minimum, while JJVC's ACUVUE ADVANCE AND ACUVUE 2 have Dk/t levels below that threshold. In addition, CIBA's marketing letter claims that O₂OPTIX has a Dk/t "well above the minimum standard of 90 Dk/t ... to reduce the risk of severe corneal hypoxic stress during daily lens wear." CIBA's claims regarding the 90 Dk/t "critical minimum" or "minimum standard" are all predicated on the Hill Article, and, thus, are "establishment claims." (*See* PX 2; PX 3; DTX 33.)

Plaintiff argues that CIBA's claim that 90 Dk/t is a critical minimum to avoid severe hypoxic stress is literally false because the Hill Article does not establish

the existence of such a standard. The Court finds that Plaintiff has carried its burden of demonstrating that the study results described in the Hill Article are not sufficiently reliable to permit one to conclude with reasonable certainty that the study establishes the proposition that 90 Dk/t is a "critical minimum" to avoid severe hypoxic stress.

The language and graphic representations included in the O₂OPTIX promotional materials leave the reader with the unmistakable impression that 90 Dk/t has been established as a key threshold below which severe hypoxic stress cannot be avoided. The Hill Article, however, does not support such a clear-cut divide. In fact, the study described in the Hill Article, the results of which were characterized by Ostrem, Fink and Hill as "pilot findings," does not establish that the effects of hypoxic stress are significantly more or less severe at 90 Dk/t than at levels between 50 and 90 Dk/t, or above 90 Dk/t, because the authors did not test such other oxygen transmissibility levels. As noted above (*supra* pp. 11–12), Hill testified that, once the whole picture came into view based on the results of later studies that incorporated a wider range of data points, it became clear that "90 was just a point on the continuum, not a particularly distinctive point," and that the 90 Dk/t level was not special "along the spectrum of say 80, 70, or 110 or 120 going in the other direction." (Hill Tr. at 27, 94.)

It is clear from the evidence presented at trial that Dr. Hill and his colleagues did not conclude from their study that 90 Dk/t is a critical level of transmissibility required to protect contact lens users from severe hypoxic stress with daily wear. It is also clear from the trial evidence that there is no agreement among scientists or contact lens clinicians as to the identification of such a critical level. (Trial Tr. at

500.) CIBA's witness Dr. Daniel Harvitt acknowledged that a wide range of Dk/t values have been posited as minimums to avoid severe hypoxic stress, and that many people in the contact lens community have proposed minimum values lower than 90 Dk/t. (*Id.*) While the Hill Article does seem to indicate that lenses with Dk/t values higher than 90 are generally desirable, and recommends further research in this connection, the Court finds that the Hill Article does not provide a basis for concluding with reasonable certainty that 90 Dk/t is a special bench mark or "critical minimum" to avoid severe hypoxic stress. Accordingly, the Court finds that, because the Hill Article is insufficient to allow the Court to conclude with reasonable certainty that 90 Dk/t is a critical minimum threshold to avoid severe hypoxic stress with daily wear, Plaintiff has thus met its burden of demonstrating that CIBA's establishment claim is literally false.

For substantially the same reasons, and upon careful consideration of the testimony of Drs. Benjamin, Schnider, Hill, Harvitt, Dillehay, and Holden, the Court further finds that Plaintiff has proven literally false as a general matter CIBA's claim that 90 Dk/t is a critical minimum level for the avoidance of severe hypoxic stress.

 Plaintiff has also met its burden, as to CIBA's claim that 90 Dk/t is a critical minimum to avoid severe hypoxic stress with daily wear, with respect to the other elements of a false advertising claim under Section 43(a) of the Lanham Act. "Once it is determined that a statement is false, it is presumed to be material." *Telebrands Corp. v. E. Mishan & Sons*, No. 97 Civ. 1414(RPP), 1997 WL 232595, at *22 (S.D.N.Y. May 7, 1997). Further, the Court finds that there is a likelihood that Plaintiff will suffer a loss of goodwill from the portrayal of Plaintiff's products as failing to provide a "critical minimum [of oxygen transmissibility necessary] to avoid severe hypoxic stress," and that the challenged advertising has been disseminated in interstate commerce.

Therefore, the Court concludes that Plaintiff has satisfied its burden of proving that CIBA's claims regarding the significance of 90 Dk/t in connection with severe hypoxic stress are literally false and thus violative of Section 43(a) of the Lanham Act.

*Plaintiff's Contention that CIBA's Comfort Preference Claim is False*

As discussed above, CIBA contends in its sales aid that "75% of lens wearers preferred O$_2$OPTIX to ACUVUE ADVANCE" and that "[t]he #1 reason was comfort." (PX 2.) CIBA's advertising cites "Data on file" from a "double-masked, randomized clinical study where all patients wore both lenses," as the basis for these claims. They, therefore, are establishment claims. Plaintiff JJVC argues that CIBA's claims are literally false because the results of the CIBA study cited in the promotional materials are not sufficiently reliable to allow one to conclude with reasonable certainty that the study established these propositions. The Court concludes that Plaintiff has satisfied its burden only with respect to CIBA's claim that 75% of lens wearers in the study *preferred* O$_2$OPTIX to ACUVUE ADVANCE.

 CIBA, as noted earlier (*supra* p. 15), predicates its claim that 75% of subjects in the study preferred O$_2$OPTIX to ACUVUE ADVANCE on the results of a forced choice survey item in which participants were asked at the study's four-week interval which lens they preferred overall. The results at the four-week interval were statistically significant in that 15 participants chose O$_2$OPTIX and 5 participants chose ACUVUE ADVANCE. However,

when the participants were then asked their primary reason for their forced choice overall preference, 7 of the 20 participants (5 who had chosen $O_2$OPTIX as their overall preference and 2 who had chosen ACUVUE ADVANCE) chose "randomly selected." As explained above, such data suggests that fewer than 75% of the study participants actually *preferred* $O_2$ OPTIX to ACUVUE ADVANCE at the four-week interval. The Court therefore finds that the data in the study do not support with reasonable certainty the claim made in CIBA's promotional materials: that "75% of lens wearers *preferred* $O_2$ OPTIX to ACUVUE ADVANCE." (PX 2) (emphasis added). Plaintiff has thus carried its burden of demonstrating that CIBA's claim that 75% of its study participants preferred $O_2$OPTIX over ACUVUE ADVANCE is violative of Section 43(a) of the Lanham Act.[7]

■ Plaintiff has, however, failed to carry its burden of proving the falsity of CIBA's claim that the study participants' "# 1 reason" for choosing $O_2$OPTIX was "comfort." Plaintiff asserts that the fact that the results were not statistically significant when subjects were forced to make preference choices regarding several comfort-related parameters, such as comfort after insertion, comfort at the end of the day, and comfort overall, undermines the reliability of the forced-choice-reason-for-overall-preference parameter relied on by CIBA to support its claim. The responses to the forced-choice-reason-for-overall-preference parameter at the four-week interval show, however, that comfort was clearly selected as the primary reason more often than any of the other reasons mentioned in the study, and all 8 of the persons who chose comfort as the primary

reason made $O_2$OPTIX their overall preference choice. The lack of statistical significance of responses to other comfort-related items does not render unreliable or false CIBA's simple arithmetical claim in this regard.

■ Plaintiff has also failed to demonstrate that CIBA's study was rendered unreliable in its entirety by the use of lenses with visible inversion markings, particularly in light of Dr. McNally's credible testimony that the $O_2$OPTIX lenses actually bore a numerical code and not the word "CIBA" as the CIBA study report had indicated. (Trial Tr. at 428.) Plaintiff has not proffered any evidence that the subjects knew which marking corresponded to which lens or that any of them discerned which lens was which.

■ The Court also declines Plaintiff's invitation to conclude that the study's results are rendered unreliable due to an inherent bias arising from the fact that a significant number of the study's participants were CIBA employees. CIBA proffered credible evidence that having company employees participate in substantiation studies is a standard practice in the industry (Trial Tr. at 422), and Plaintiff has not proffered any evidence that the study participants knew or believed that the data was being gathered to support a preference claim for advertising. Nor does the trial evidence support any reasonable inference that, even if participants discerned the purpose of the study, they knew which of the lenses was the CIBA product or would falsely have expressed a preference for the CIBA product.

■ The Court further finds that CIBA's claims are not rendered unreliable

---

7. As explained above, Plaintiff's evidence meets the other Section 43(a) criteria, namely, likelihood of loss of goodwill, materiality, and use of the offending statement in interstate commerce.

by the fact that they are based solely on the data taken at the four-week interval even though the data taken at earlier and later intervals yielded results that were not statistically significant, especially given that CIBA has proffered credible evidence that the main purpose of the study from the outset was to measure the results at the end of one month. (Trial Tr. at 421.)

Thus, with respect to CIBA's claims that are based on the preference study, the Court finds that Plaintiff has satisfied its burden of proving a false advertising claim under Section 43(a) of the Lanham Act only with respect to CIBA's claim that 75% of contact lens wearers in their comfort preference study *preferred* O₂OPTIX to ACUVUE ADVANCE.

*Plaintiff's Contention that CIBA is Making a False Overall Health Superiority Claim*

 Plaintiff contends that CIBA's sales aid, when considered in its entirety, makes a claim that O₂OPTIX is a healthier lens overall than the ACUVUE lenses. Although the language of the sales aid does not explicitly make a claim of overall health superiority, Plaintiff asserts that such a claim is being made by "necessary implication." " 'A claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.' " *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson–Merck Consumer Pharmaceuticals Co.,* No. 01 Civ. 2775(DAB), 2001 WL 588846, at *8 (S.D.N.Y. June 1, 2001) (quoting *United Indus. Corp. v. Clorox,* 140 F.3d 1175, 1181 (8th Cir.1998)). "The doctrine of 'necessary implication' involves a finding that a claim, as communicated by the visual and

verbal representations of the advertisement, is literally false ... and thus, is distinct from a finding of implied falsity, where the claim is literally true but deemed misleading." *SmithKline Beecham,* 2001 WL 588846 at *8 n. 14. To be found false by necessary implication, the challenged advertisement must be "susceptible to no more than one interpretation." *Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. The Procter & Gamble Co.,* 285 F.Supp.2d 389, 391 (S.D.N.Y.2003).

The parties dispute whether the Court should recognize and apply the doctrine of literal falsity by necessary implication. While a number of district courts in this Circuit have recognized and applied the doctrine, *see, e.g., SmithKline Beecham,* 2001 WL 588846, at least one has refused to recognize and apply it. *See Novo Nordisk A/S,* 997 F.Supp. at 473 n. 7. The Second Circuit, in a recent unpublished decision, observed that it has "yet to adopt [the doctrine of necessary implication]," although it acknowledged that courts within the circuit have applied the doctrine. *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson–Merck Consumer Pharm. Co.,* 19 Fed.Appx. 17 (2d Cir.2001). Defendant urges the Court either to refuse to recognize and apply the doctrine at all or, in the alternative, to apply the doctrine, but require Plaintiff to offer extrinsic evidence that eye care professionals (the group to which the challenged advertising is directed) understand the advertising to be making a health superiority claim.[8] The Court need not determine whether to recognize the doctrine of necessary implication, with or without the requirement of extrinsic evidence, however, because even assuming that

---

8. Defendant's assertion that extrinsic evidence should be required is itself controversial; extrinsic evidence of the target audience's reaction is typically required only in connection with implied falsity claims.

Plaintiff has proven that CIBA is making an overall health superiority claim by necessary implication, Plaintiff has failed to prove the claim false.[9]

"Where the defendant's advertisement claims that its product is superior, plaintiff must affirmatively prove defendant's product equal or inferior." *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir.1992). It is undisputed that $O_2$ OPTIX has a higher Dk/t than ACUVUE ADVANCE or ACUVUE 2 and that oxygen uptake is a factor in ocular health. The trial evidence also establishes that higher oxygen transmissibility-rated contact lenses make more oxygen available to the cornea. While there are disputes over the quantification and significance of the marginal additional benefit provided by very high Dk/t lenses to daily wear users, the evidence suggests, and Plaintiff has failed to prove otherwise, that contact lens wearers do generally receive at least some benefit as the Dk/t value increases. (*See* Trial Tr. at 105–06, 155, 569.) That said, the evidence also shows that there are a number of factors besides oxygen that affect the overall ocular health of contact lens wearers and that, in order to assess whether a particular brand of contact lens is healthier overall than another brand, one must consider these factors along with oxygen transmissibility.

Plaintiff points to several studies in support of its contention that $O_2$OPTIX is not healthier overall than ACUVUE ADVANCE and ACUVUE 2. First, Plaintiff relies on a clinical study conducted by JJVC in which ACUVUE 2 and ACUVUE ADVANCE purportedly outperformed CIBA's FOCUS NIGHT & DAY lens, which has a Dk/t value even higher than that of $O_2$OPTIX, with respect to certain symptomology that is identified in the CIBA sales aid as related to "corneal oxygen deficiency." (Trial Tr. at 145–57.) That study, however, did not involve the $O_2$ OPTIX lens and thus yields no specific information about how $O_2$OPTIX compares to the ACUVUE lenses with regard to relevant factors other than oxygen transmissibility. The Court, thus, concludes that the results of that study do not prove that $O_2$OPTIX is equal or inferior to ACUVUE ADVANCE or ACUVUE 2. Second, Plaintiff cites the 2004 CIBA Study, which yielded results that were not statistically significant when study subjects were asked to choose between $O_2$OPTIX and ACUVUE ADVANCE with respect to the various signs of corneal oxygen deficiency that were referred to in the sales aid. (PX 10.) However, CIBA proffered credible evidence that the comfort preference study was not designed to yield statistically significant results related to such signs and symptoms. (Trial Tr. at 482–83.) Thus, the Court finds that the fact that certain 2004 CIBA Study results were not statistically significant does not prove that $O_2$ OPTIX is equal or inferior to ACUVUE ADVANCE or ACUVUE 2.

Third, Plaintiff cites the results of a clinical study conducted by CIBA and submitted to the U.S. Food and Drug Administration ("FDA") in connection with CIBA's application for FDA approval of $O_2$

---

9. As explained earlier, Plaintiff has proven that CIBA's assertion that 90 Dk/t is a critical level of oxygen transmissibility is false. The Court's analysis of the health superiority claim issue in this proceeding seeking injunctive relief focuses on the remaining elements of the advertising materials. Because CIBA will be enjoined from making future use of the 90 Dk/t claim, the Court need not determine in this phase of the proceedings whether CIBA's advertising in its original form made a claim by necessary implication that CIBA's lens is healthier because it, unlike JJVC's lenses, exceeded a "critical minimum" threshold of transmissibility.

OPTIX. (PX 9.) [10] Plaintiff points out that CIBA's FDA submission reports similar overall performance with respect to vision, health, comfort and fit when $O_2$OPTIX is compared to ACUVUE 2. However, CIBA has proffered credible evidence that the FDA submission was designed only to demonstrate that the FDA's substantial equivalence requirements were met, and not to test superiority or inferiority. (*Id.* at 439.) Thus, the Court finds that the FDA submission results do not prove that $O_2$OPTIX is equal to or inferior to the ACUVUE lenses. Finally, Plaintiff cites certain draft internal CIBA data comparing an aspect of performance of the two lenses (PX 8). The Court finds that the data do not prove that $O_2$OPTIX is equal or inferior to the ACUVUE lenses in terms of overall ocular health. The trial evidence did not establish the superiority, equality, or inferiority of either lens. Plaintiff has thus failed to meet its burden of proving that CIBA's overall health superiority claim is literally false.

 To the extent that Plaintiff contends that CIBA's overall health superiority claim is impliedly false, *see* Pl's Proposed Findings of Fact and Conclusion of Law at 40, CIBA's Rule 52(c) motion for judgment in its favor on partial findings is granted, as Plaintiff has neither introduced the requisite extrinsic evidence of consumer reaction showing that CIBA's promotional materials tend to mislead or confuse the target audience of eye care professionals, nor adequately demonstrated that CIBA has intentionally tried to deceive the public in an egregious fashion as to the health benefits of $O_2$OPTIX. *See Johnson & Johnson Merck,* 960 F.2d at 297–99.

*Irreparable Harm*

 Under Section 43(a), a court "will presume irreparable harm where plaintiff demonstrates a likelihood of success in showing literally false defendant's comparative advertisement which mentions plaintiff's product by name.'" *S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 238 (2d Cir.2001) (quoting *Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 62 (2d Cir.1992)). Here, Plaintiff has proven that Defendant's claim that 90 Dk/t is a critical minimum oxygen transmissibility level for the avoidance of severe hypoxic stress with daily wear is false, and that Defendant's claim, based on the CIBA preference study, that 75% of the study participants preferred $O_2$OPTIX over ACUVUE ADVANCE is a literally false establishment claim. Both claims appear in comparative advertising that mentions Plaintiff JJVC's products by name. The Court, accordingly, presumes that Plaintiff will suffer irreparable harm in the absence of injunctive relief. Furthermore, Plaintiff has presented credible evidence of reputational harm arising from the 90 Dk/t claim, in the form of testimony by David Smith, JJVC's Vice President of Sales, that JJVC received multiple queries from ECP's and customers concerning whether the ACUVUE lenses meet minimum oxygen transmissibility requirements after CIBA began to disseminate its $O_2$OPTIX promotional materials. (Trial Tr. at 234, 242.)

*Defendant's Motion for Judgment on Partial Findings Pursuant to Federal Rule of Civil Procedure 52(c)*

Defendant CIBA moved after the close of Plaintiff's case for a judgment on partial

10. To receive FDA approval for a new contact lens, the manufacturer must provide adequate evidence that the product is as safe and effective as a legally marketed product. (*Id.* at 438.)

findings pursuant to Fed.R.Civ.P. 52(c), which provides as follows:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained ... without a favorable finding on the issue ... or the court may decline to render any judgment until the close of all evidence."

The Court reserved judgment on the motion. Having considered the motion in light of the record at the close of Plaintiff's case, and as explained above (*supra* p. 29), the Court has determined that CIBA is entitled to judgment as a matter of law to the extent Plaintiff JJVC asserts an implied falsity claim because JJVC failed to introduce evidence of relevant target audience reaction to the advertising. Plaintiff's evidence with respect to the remainder of its claims was sufficient to frame issues of fact for resolution by the Court. Defendant's Rule 52(c) motion is, accordingly, denied in all other respects.

### RELIEF

For the reasons explained above, Plaintiff JJVC is entitled to permanent injunctive relief with respect to CIBA's claims in the challenged advertising insofar as they are based on the 90 Dk/t oxygen transmissibility level and insofar as they are based on the proposition that 75% of the participants in the 2004 CIBA Study preferred $O_2$OPTIX over ACUVUE ADVANCE.

Defendant CIBA, its officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with CIBA who receive actual notice of this Order, are hereby permanently enjoined from:

1) stating or otherwise representing, directly or indirectly, in CIBA's promotional activities that 90 Dk/t is a critical minimum threshold for the avoidance of severe hypoxic stress in daily wear of contact lenses, and from making statements of similar import; and

2) stating or otherwise representing in its promotional activities, on the basis of its consumer preference study conducted from January 6, 2004, to February 27, 2004, that 75% of the participants in that study preferred $O_2$ OPTIX over ACUVUE ADVANCE.

Plaintiff has also proven that it is entitled to further injunctive relief in the form of required corrective advertising in respect of CIBA's promotion of the 90 Dk/t oxygen transmissibility level as critical. The parties are directed to confer immediately and to file with the Court, within seven (7) days from the date of this decision, a proposed form of corrective written communication from CIBA to eye care professionals. If the proposed form of communication is not a joint submission, the parties' respective proposals shall be served on opposing counsel contemporaneously with their submission to the Court, and any objections shall be filed and served within two days after submission of the original proposals. The proposals shall also include suggested means and a timetable for dissemination of the communication to eye care professionals.

### CONCLUSION

Plaintiff JJVC's request for permanent injunctive relief is granted to the extent set forth in the preceding section of this Opinion. It is denied in all other respects.

Defendant's motion pursuant to Rule 52(c) of the Federal Rules of Civil Procedure is granted to the extent Plaintiff as-

serts claims of implied falsity and is denied in all other respects.

The parties shall meet promptly with Magistrate Judge Henry B. Pitman, to whom this case is now referred for general pretrial management, to discuss settlement of the remaining issues in this case and for entry of any necessary further scheduling orders.

IT IS SO ORDERED.